## NATIONAL LABOR RELATIONS BOARD v. SUBURBAN LUMBER CO.

### No. 7473.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

Leslie Clifford, of Washington, D. C. (Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolf, and David C. Sachs, all of Washington, D. C., on the brief), for petitioner.

Floyd H. Bradley, of Camden, N. J. (French, Richards & Bradley, of Camden, N. J., Grace Heritage Smith, of Camden, N. J., on the brief), for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

CLARK, Circuit Judge.

Our courts have been addressed by the constant contention that the National Labor Relations Board lacks jurisdiction.[1] This is the more remarkable in view of its complete lack of success. Locusts destroy but appeals against regulation by the National Labor Relations Board of business on the ground that it is intrastate are harmless insects indeed. We know of

---

[1] N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; N. L. R. B. v. Fruehauf Trailer Co., 301 U.S. 49, 57 S. Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; N. L. R. B. v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S. Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L. Ed. 1014. Australia has limited these appeals by enabling a single justice of the High Court to decide whether there is an industrial dispute extending beyond the limits of any one state. His decision is final and nonappealable. Commonwealth Conciliation and Arbitration Act, § 21aa. This amendment was upheld in Federate Engine-Drivers' and Firemen's Ass'n v. Colonial Sugar Refining Co., Ltd., 1916, 22 C.L.R. 103. See Quick, Legislative Powers of the Commonwealth and States of Australia 538. In Canada, on the other hand, the Dominion Industrial Disputes Investigation Act of 1907 passed with the object of bringing about settlement of industrial disputes between employers and employees was held to be ultra vires, since it was a law relating to matters which by Section 92 of the British North America Act were placed within the exclusive jurisdiction of the provinces. This was not justified as an exercise of the Dominion's powers under Section 91 with respect to criminal law. In re Reciprocal Insurance Legislation (1924) A.C. 328, 93 L.J.P.C. 137, (1924) 2 W.W.R. 397, (1924) 1 D.L.R. 789. Or with respect to the regulation of trade and commerce. Citizens Ins. Co. v. Parsons, 7 App.Cas. 96, 51 L.J.P.C. 11, C. R. (8) A.C. 406. Or with respect to the peace, order and good government of Canada. Russell v. R., 7 App.Cas. 829, 51 L.J.P.C. 77, C.R. (8) A.C. 502. Nor can it be valid without evidence of an emergency putting the national life in unanticipated peril. Toronto Electric Commrs. v. Snider (1925) A.C. 396, 94 L.J.P.C. 116, 132 L.T. 738, reversing 55 O.W.L. 454, (1924) 2 D.L.R. 761. See Lefroy, Canada's Federal System, 112–122; 138–143; 230–236. Labour Laws regulating wages, working hours and rest days in industrial undertakings enacted by the Dominion Parliament are not valid legislation, within the dominion powers under Section 91 of the British North America Act "to make laws for the peace, order and good government of Canada"; such legislation being exclusively within the competence of the Province under its powers as to "property and civil rights" is ultra vires the Dominion. Atty.-Gen. of Can. v. Atty.-Gen. of Ont., Reference Re Weekly Rest in Industrial Undertakings Act, Minimum Wages Act and Limitation of Hours of Work Act (P.C.) (1937) 1 D.L.R. 673, 1 W.W.R. 299, affirming (1936) 3 D.L.R. 673, S.C.R. 461.

only one case in which any court has dismissed the Board's petition for that reason. There the business sought to be controlled was a California gold mining company and the only interstate elements were the purchase of supplies manufactured outside the state and the shipment of some gold to a mint in Colorado.[2]

How different is the case at bar appears from its undisputed facts. The respondent is a retail lumber dealer of Oaklyn, near Camden, New Jersey. The cash value of its sales for 1936 was a little over $200,000 and 99% of them were made within New Jersey. In the same period the Suburban's purchases were slightly less than $150,-000. Inasmuch as New Jersey was settled before the days of conservation, this lumber came from other parts of the country, as might be expected. The record does not show precise percentages but there is testimony that 90% of the purchases were made from twelve named firms, all but one of which were located outside of New Jersey. In addition to two managing officials and three office workers, respondent had ten or eleven other employees, seven of whom were truck drivers. The lumber was mostly picked up at Philadelphia wharves and the general manager estimated that 16% of his drivers' time was so consumed. The Board has found that there is substantial evidence to support the conclusion that seven of these drivers were discharged for joining the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America. On August 2, 1937 the Board ordered reinstatement of and back pay from the day of discharge for these seven employees. The Act[3] provides that the Board shall "cause" such an order "to be served" on the persons affected thereby. By a further provision of the same Act, the service requirement is held to be complied with: "* * * either personally or by registered mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served." 29 U.S.C.A. § 161(4).

In the principal case the respondent received at its only office a copy of the Board's decision which contained an order ending as follows: "(e) Notify the Regional Director for the Fourth Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply herewith." Appendix to Respondent's Brief p. 3.

■■ From this recital it is clear that respondent can advance only two arguments against jurisdiction. It can argue size and it can argue direction. The first contention has been expressly decided against it by the United States Supreme Court[4] and the second is untenable by the ratio decidendi of its decisions. We are concerned here with the utilization rather than the extent of the commerce power. The National Labor Relations Act uses what have been described as words of art to indicate the fullest employment of this Congressional authority.[5] The selection of the word "affect" is of recent origin. Although it appears in the language of some of the earlier Supreme Court opinions,[6] it only found its way into relatively new legislation, and so is not present in such statutes as the Federal Trade Commission,[7] the old Employers' Liability Act,[8] and the Sherman Act.[9] They qualify interstate commerce with such words as "in", "engage in" or "restraint",[10] whereas such modern statutes as the National Labor Relations Act,[11] the Bituminous Coal Act,[12]

[2] N. L. R. B. v. Idaho-Maryland Mines Corp., 9 Cir., 98 F.2d 129; distinguished in two coal mining cases. N. L. R. B. v. Crowe Coal Co., 8 Cir., 104 F.2d 633, 639; N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 784.

[3] 29 U.S.C.A. § 160(c).

[4] N. L. R. B. v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014.

[5] Effect of Increased Congressional Power Upon Statutory Construction of Existing Laws: The Bunte Case, 50 Yale Law Journal 1294.

[6] See for example, Houston, E. & W. Texas R. Co. v. United States, 234 U. S. 342, 34 S.Ct. 833, 58 L.Ed. 1341.

[7] 15 U.S.C.A. §§ 44, 45(a).

[8] 35 Stat. 65 (1908) 45 U.S.C.A. §§ 51–59.

[9] 15 U.S.C.A. § 1.

[10] Apex Hosiery Co. v. Leader, 310 U. S. 469; Shulman, Labor and the Anti-Trust Laws, 34 Illinois Law Review 518; Labor and the Sherman Act, 49 Yale Law Journal 518; Sitdown Strike Not Substantially Affecting Market Held Not In Restraint of Trade Under Sherman Act, 54 Harvard Law Review 146; Labor Law —Sit-Down Strike—Triple Damages Under Sherman Act, 39 Columbia Law Review 1247.

[11] 29 U.S.C.A. §§ 152(7), 159(c), 160 (a).

[12] 15 U.S.C.A. § 834.

832

and the new Employers' Liability Act,[13] prefer the more vehement "affect". That the word has the widest conceivable scope is apparent both from its dictionary definition and its judicial interpretation. The dictionary says: "To act upon; produce an effect on; touch",[14] and the cases are equally unanimous in emphasizing this inclusive character and so hold it to mean "acting upon", "working a change in" or "concerning".[15] In a very recent case the United States Supreme Court divided because of failure of the statute to use the word.[16]

In this view, percentages and such mathematical formulae are manifestly irrelevant except possibly in one respect. Using the commonly accepted watercourse metaphor, a thimble affects a brook, a bucket affects a stream and a spillway affects a river. As the mathematical formulae have been applied one would be led to believe that regulation in a field of commerce little occupied in the United States is more authorized than that of a quite large business in, let us say, steel. Although this distinction seems logical to us, we must admit that the cases do not stress it.[17] However that may be, the point is not involved here because there is no testimony as to the relation between the approximately $150,000 purchases and the amount of lumber shipped across state lines. In the Fainblatt case the United States Supreme Court has expressly held: "* * * Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can

perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim de minimis." N. L. R. B. v. Fainblatt, 306 U. S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014.[18]

■■ De minimis in the law has always been taken to mean trifles—matters of few dollars or less.[19] Here, the Suburban's interstate purchases in a year when the retailer lumber business was at its nadir amounted to $150,000. Such a sum surely cannot be considered in the category of de minimis. Even if the maxim were to be applied to the very small lumber dealer, Suburban would be outside the application, for Suburban is the average size of the lumber retailer in its vicinity.[20] Certainly no average sized retailer could escape the operation of the Sherman Anti-Trust Act on the ground that the effect of its restraint upon interstate commerce was not substantial. If the Suburban combined with other retailers in the restraint of trade, there can be no question but that Suburban would be liable to prosecution under the Sherman Act. While it is true that the conspiracy or combination would be the element which would render the Suburban criminally or civilly liable, Federal jurisdiction would be conferred solely because Suburban's individual restraint substantially burdened interstate commerce. Assuming the conspiracy, Suburban would be deemed liable because its individual restraint had been magnified by the combina-

[13] 45 U.S.C.A. § 51.

[14] 1 The New Century Dictionary, Affect, p. 21.

[15] 2 Words and Phrases, Perm. Ed., Affect, p. 632 et seq.

[16] Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. ——.

[17] Santa Cruz Fruit Packing v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L. Ed. 954.

[18] This decision had, in point of fact, been predicted by those writers who discussed the case in the lower court and was approved after it had been rendered. Extent of Jurisdiction of the National Labor Relations Board, 37 Michigan Law Review 934. "If the court is not repudiating the requirement of substantiality of effect on interstate commerce, a meaning other than size must be attributed to the term. Conceivably it might merely be a synonym for 'close' or 'di-

rect', and there was no doubt as to the proximity of respondent's labor relations to interstate commerce", Jurisdiction of The National Labor Relations Board, 37 Michigan Law Review 1328, 1330. "The act is not confined in its jurisdiction to industries operating upon a nationwide scale. It extends to and embraces within its scope all activities, large or small, which are, or which affect, 'commerce' as defined in it." N. L. R. B. v. Bell Oil & Gas Co., 5 Cir., 91 F.2d 509, 512. See, also, Jeffery-De Witt Insulator Co. v. N. L. R. B., 4 Cir., 91 F.2d 134, 112 A.L.R. 948, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565, where the yearly gross business was only $23,000.

[19] 12 Words & Phrases, Perm.Ed., De Minimis Non Curat Lex, p. 31; 76 Solicitor's Journal 628; 20 Law Notes 85; 29 Irish Law Times, 5.

[20] This fact is disclosed by a survey of The Lumbermen's Credit Rating.

tion. Similarly, although no conspiracy has been alleged in the case at bar, Suburban's unfair labor practice can cause responses far removed from the original source of agitation and these responses may become more intensified as the ripple proceeds away from the spot in which the disturbance was first manifested.

It seems unnecessary to spend much time on the argument from "direction". The legal periodicals have treated with it convincingly:

"Normally, a stoppage of operations due to labor difficulties in a particular enterprise engaged in production or distribution will not interfere with the movement of goods among the states. It will interfere only if the company affected does a substantial interstate business. Starting with this assumption, the various types of activity which may be held to come within the act fall into three groups. The first group consists of those industries which depend to a large extent upon other states to supply both the raw materials and markets for their products. * * *

"The second group of industries intimately related to commerce comprises those which obtain their products from local sources but sell the bulk of it to extra-state consumers. The best known illustrations of such businesses are mining, lumbering, quarrying, and the production of oil and gas. Attempts to subject these enterprises to regulation under the act have been made, but these attempts have not as yet been passed upon by the Supreme Court. When they are, however, there is strong likelihood that the Court will sustain the action of the Board.

"There are several reasons for this conclusion. In the first place, the Court refused to confine its decision to companies in the current of commerce. By doing so, it could easily have excluded enterprises at either end of the stream. Instead, it adopted a much broader basis to sustain the regulation by holding that 'burdens and obstructions may be due to injurious action springing from other sources.' In addition to this, labor disturbances in industries which merely export goods into other states have been held to constitute a restraint upon commerce. Finally, the concerns involved are vitally dependent upon the interstate movement of their commodities.

"For the same reasons, the act would seem to embrace a third type of business—companies which receive a large proportion of the materials needed for production or for distribution from other states, but which sell practically all of their goods to local or intrastate purchasers. * * * Certainly, labor difficulties occurring at this stage of commercial intercourse may burden the free flow of commerce among the states just as effectively as those arising at its source. The Court itself took this position when it said 'the fact that the means operated at one end before physical transportation commenced and at the other end after the physical transportation ended was immaterial.'" Mueller, Businesses Subject To The National Labor Relations Act, 35 Michigan Law Review 1286, 1294–1296.[21]

And it has been held in one case: "There can be no difference in principle between the case in which manufacture precedes and that in which it follows interstate commerce. If the flow of commerce is obstructed by labor disputes, it can make no difference from which direction the obstruction is applied." Newport News Shipbuilding & Dry Dock Co. v. N. L.R.B., 4 Cir., 101 F.2d 841, 843.

To revert to our watercourse metaphor, the thimble, the bucket and the spillway remove just as much water no matter at what part of the brook, stream or river they are applied.

■ The respondent complains not only of the Board's jurisdiction to issue an order but also of the extent of that order. It emphasizes the three years' delay in enforcement and asserts that to impose back pay for all of that time is both unfair and financially fatal. The failure to enforce is only unjust if respondent had no right of appeal. The Act makes it quite plain that if the Board's order gave it jurisdiction, the respondent was thereby "ag-

---

[21] Constitutional Law—Interstate Commerce—Jurisdiction of the N. L. R. B. Over Intrastate Power Company, 87 University of Pennsylvania Law Review 480; Interstate Commerce Jurisdiction of the N. L. R. B., 47 Yale Law Journal 1221; Constitutional Law—Commerce Power: Jurisdiction of the National Labor Relations Board, 24 Cornell Quarterly 244, 245 et seq.

grieved" and so could apply for correction of his wrong.[22] We do not have therefore a case of delay in the proceedings before the Board.[23]

■■ Earlier in this opinion we quoted the service of process provision of the National Labor Relations Act.[24] It is in the conventional form and there is, therefore, plenty of interpretative authority. The question is not, of course, whether what was served here is a copy. It requires no citation to sustain the view that an unsigned and undated paper is not a copy of an order that has a signature and a date. The issue is rather should we give a strict or a liberal construction to these service statutes. The courts disagree and are about evenly divided.[25] Two writers describe the controversy:

"Ceremonial requirements are in constant conflict with the practical notion that the only importance of the summons is to give notice. It can be argued that, if the defendant knew about the suit or if he knows about it at the present time, there is no reason why he should be excused from defending because the summons is not correctly written or served. This argument is usually defeated by the instinctive feeling that, if the courts ever become practical about the summons, the judicial process will lose some of its dignity. For this reason carelessness in preparing and serving a summons is always embarrassing and sometimes costly." Arnold and James, Trials, Judgments, and Appeals, 259.

We prefer to be practical and fear no corresponding loss of dignity. If respondent's counsel had any doubts about the paper served on him, he knew the address of the office where a practical man could have these doubts resolved.

■ Perhaps because of its insistence upon the technical point we have just been discussing, respondent seems to have given very little attention to a much more valid reason for cutting down its liability. Both the Board and the Courts of Appeals have followed the statute [26] in acknowledging the defense of "substantially equivalent employment".[27] In other words, the discharged employee cannot be paid twice for the same working hours. The Board, however, has not acknowledged any obligation to minimize damages. It has not compelled the discharged employee to seek work. One of such orders has been enforced [28] and the other modified [29] in the Circuit Court of Appeals. In the refusal to follow the universal principle of mitigation of damages [30] the statute has been given its punitive interpretation. Such an interpretation has been expressly disapproved.[31] Since the statute is remedial, as the United States Supreme Court has declared, there is only this reason to depart from the gen-

[22] 29 U.S.C.A. § 160(f).

[23] Wigger, Delay in Proceedings Under The National Labor Relations Act, 28 Georgetown Law Journal 1102; Palmer, Back Pay Orders Under The National Labor Relations Act, 29 Georgetown Law Journal 580, 593; Back Pay Orders Under The National Labor Relations Act, 48 Yale Law Journal 1265.

[24] 29 U.S.C.A. § 161(4).

[25] 50 C.J., Process, Effect of Lack of Proper Signature, p. 462.

[26] 29 U.S.C.A. § 152(3).

[27] Mooresville Cotton Mills v. N. L. R. B., 4 Cir., 97 F.2d 959; N. L. R. B. v. Botany Worsted Mills, 3 Cir., 106 F.2d 263; John Minder & Sons, Inc., 6 N.L.R.B. 764; Willard, Inc., 2 N.L.R.B. 963; cf. Labor Law—National Labor Relations Act—Similar Work Lasting Three Months Held Not Regular and Substantially Equivalent Employment, 52 Harvard Law Review 1365.

[28] Carlisle Lumber Company, 2 N.L.R. B. 248.

[29] Phelps Dodge Corp. v. N. L. R. B., 2 Cir., 113 F.2d 202, 206.

[30] Payzio, Ltd., v. Saunders, [1919] 2 K.B. 581; Williston, Contracts, § 1397, and cases cited.

[31] Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6; Master and Servant—Discharge of Power of N. L. R. B. to Award Back Pay to Relief Agencies, 25 Minnesota Law Review 529; Master and Servant—Arbitration and Determination of Deductive Powers of N. L. R. B., 15 University of Cincinnati Law Review 109; Labor Law —Authority of N. L. R. B. to Order Payment of Work Relief Deductions to Government Agencies, 89 University of Pennsylvania Law Review 527; Labor Law— N. L. R. Act Order for Reimbursement of Government Agencies of Back Pay Provisions Invalid, 27 Virginia Law Review 399; Labor Law—Back Pay Requirement of Deductions of Reimbursement of Government Relief Agency, 39 Michigan Law Review 328; N. L. R. B. Act—Back Pay Award to Reimburse Relief Agency, 21 Boston. University Law Review 177; N. L. R. B. Use of Back Pay Order to Reimburse Work Relief Agencies, 50 Yale Law Journal 407.

eral rule. To inquire into each and every discharged employee's conduct since he has ceased work may be difficult as an administrative matter. Mr. Justice Frankfurter answers this objection and in our judgment disposes of the whole matter in a recent opinion. He says:

"Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces. Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred. To this the Board counters·that to apply this abstractly just doctrine of mitigation of damages to the situations before it, often involving substantial numbers of workmen, would put on the Board details too burdensome for effective administration. Simplicity of administration is thus the justification for deducting only actual earnings and for avoiding the domain of controversy as to wages that might have been earned.

"But the advantages of a simple rule must be balanced against the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment. The Board, we believe, overestimates administrative difficulties and underestimates its administrative resourcefulness. Here again we must avoid the rigidities of an either-or-rule. The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act. And in applying its authority over back pay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress to attain just results in diverse, complicated situations. See (1939) 48 Yale L.J. 1265." Phelps Dodge Corp. v. N.L.R.B., April 28, 1941, 61 S.Ct. 845, 854, 85 L.Ed. ——, 133 A.L.R. 1217.[32]

The order of the Board will be modified by eliminating therefrom so much as refers to the matter of back pay which is remitted to the Board for further hearing and determination. Except as thus modified, the order will be enforced for which a decree may be submitted.

---

[32] In addition to the legal periodical cited by the learned justice, we add Palmer, Back Pay Awards Under the National Labor Relations Act: Matters of Defense, 29 Georgetown Law Journal 580, 591, 593.