### NATIONAL LABOR RELATIONS BOARD v. REED et al.

No. 13310.

United States Court of Appeals
Ninth Circuit.

June 22, 1953.

As Amended Aug. 12, 1953.

George J. Bott, Gen. Counsel, N. L. R. B., David P. Findling, Asso. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie M. Boyls and Ruth C. Goldman, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Gardiner Johnson and Thomas E. Stanton, Jr., San Francisco, Cal., for respondent George W. Reed.

Watson A. Garoni, San Francisco, Cal., for respondent In. Hod Carriers, etc.

Before STEPHENS and POPE, Circuit Judges, and McCORMICK, District Judge.

STEPHENS, Circuit Judge.

Congress, in enacting the National Labor Relations Act, 49 Stat. 499, as amended by the Labor Management Relations Act of 1947, 61 Stat. 136; 29 U.S.C.A. § 141 et seq., exercised its power to regulate commerce among the states by providing for the regulation of labor disputes which affect commerce. The Supreme Court sustained the constitutionality of the Congressional action by construing the law to exclude any attempt to interfere with strictly local activities.[1]

Prior to 1947, the Board, in its discretion, did not attempt to take jurisdiction over labor disputes in the building and construction industry. However, certain provisions of the Taft-Hartley Act were directed toward the correction of abuses prevalent in that field;[2] and probably for this reason the Board decided to end its policy of nonintervention. The Board's decision to take jurisdiction over a particular industry may not be challenged unless

---

1. National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893.

2. E.g., jurisdictional disputes; secondary boycotts; the closed shop.

in so doing it has abused its discretion or exceeded its authority under the Act or under the Constitution.[3]

The scope of the Board's power is limited by the language of the Labor Act to the prevention of unfair labor practices "affecting commerce". Section 10(a). The term "affecting commerce" is defined by the Act to mean:

"in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." Section 2(7).

"This definition is one of exclusion as well as inclusion. The grant of authority to the Board does not purport to extend to the relationship between all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce, and thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds. * * * Whether or not particular action does affect commerce in such a close and intimate fashion as to be subject to federal control, and hence to lie within the authority conferred upon the Board, is left by the statute to be determined as individual cases arise. We are thus to inquire whether in the instant case the constitutional boundary has been passed." Labor Board v. Jones & Laughlin, 1937, 301 U.S. 1, 31, 32, 57 S.Ct. 615, 621.

■ The Board's entry into the supervision of labor-management relations in the construction industry is challenged in this proceeding as a federal invasion of strictly local matters. However, it has been established that, although the construction of a building is by its nature a local activity, the importation from another state of a substantial amount of the materials used in it affects interstate commerce sufficiently to create jurisdiction in the Board.[4]

Reed, whom the Board found guilty of unfair labor practices along with the International Hod Carriers, Building & Common Laborers Union, and who is here as respondent to the Board's petition for enforcement of its order, challenges the Board's jurisdiction on the ground that he was at the time of the alleged unfair practices engaged in construction work which was of a strictly local nature and which had no effect upon commerce since he was using only materials manufactured within the state of California from local resources.

There is evidence that during the two and one-half year period prior to the acts complained of, Reed had bought only a little over $1900 worth of materials from outside California, all in 1949 for jobs other than the one in suit. The total out-of-state purchases amounted to two and one-half to three per cent of Reed's total purchases of materials for that year. Under the doctrine of *de minimis*, the small out-of-state purchases, alone, would seem to be insufficient to justify the Board in assuming jurisdiction of this case. See N.L.R.B. v. Fainblatt, 1939, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014.

In 1950 the Board clarified by its so-called "yardstick" decisions[5] the criteria under which it exercised its jurisdiction in the construction field. The Board announced that it would exercise jurisdiction over enterprises which furnish services or materials necessary to the operation of

3. N. L. R. B. v. Guy F. Atkinson Co., 9 Cir., 1952, 195 F.2d 141; N. L. R. B. v. Swinerton, 9 Cir., 1953, 202 F.2d 511.

4. N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers Local 501, A. F. of L. v. N. L. R. B., 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L. Ed. 1299; Local 74, United Brotherhood of Carpenters & Joiners of America, A. F. of L. v. N. L. R. B., 1951, 341 U.S.

707, 71 S.Ct. 966, 95 L.Ed. 1309; see, also, Polish Nat'l Alliance of U. S. of North America v. N. L. R. B., 1944, 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509; N. L. R. B. v. Ozark Dam Constructors, 8 Cir., 1951, 190 F.2d 222.

5. See "The Impact of the Taft-Hartley Act on the Building and Construction Industry", 60 Yale L.J. 672, 680, 681; Index to Labor Relations Reference Manual, BNA, 1951–1952 Supp. § 43.05.

types of businesses over which the Board would exercise jurisdiction,[6] i. e., (1) any construction firm doing $50,000 worth of business annually in services [7] for (a) an instrumentality or channel of interstate commerce,[8] (b) a public utility or transit system,[9] (c) an establishment which produces or handles goods for out-of-state shipment or which performs out-of-state services valued at over $25,000 a year;[10] (d) an establishment which operates as an integral part of a multi-state enterprise;[11] (2) any construction firm having a flow of $500,000 in materials from out-of-state or a flow of $1,000,000 annually in materials originating out-of-state but purchased from local dealers;[12] and (3) any construction firm whose work affects national defense.[13]

Although the above criteria were announced subsequent to the acts alleged in this case, we shall refer to them as a measure of the Board's proper exercise of jurisdiction. To do so is not to give them retroactive application, since the Board's exercise of jurisdiction had already been extended to the construction industry. See, e. g., NLRB v. Denver Building and Construction Trades Council, not note 4 supra, in which the Board took jurisdiction over an unfair labor practice which occurred in 1948.

There is inherent difficulty in applying the National Labor Relations Act to the building and construction business. By way of comparison, we refer to the well known fact that manufacturing companies, over which the Board has exercised jurisdiction, have sufficient continuity and identity in their businesses to preclude the necessity of re-examination with each change of product, market, or source of raw materials, while general constructing companies, by their very nature, lack these

qualities in their job-to-job operations. Such lack of continuity is caused by the differences in size and requirements of each job and results in an unstable labor force both in the identity and quantity of the personnel employed. Then, too, a builder may purchase materials from out of the state in one job or do work for a company which is engaged in interstate commerce in another job; a third job may be done for a local enterprise with local materials. Nevertheless, when a builder so conducts his activities that his undertakings include both strictly local jobs and jobs affecting commerce, he is in no different position from that of a manufacturer who engages in both local and interstate activities. The employer in both instances is engaged in commerce. That part of the work force may be engaged solely on the local aspects does not deprive the over-all activities of an employer of their interstate character. It would be so highly impractical for the Board to keep tab on every separate job of a going construction business in order to determine whether one or the other or both are in commerce that frustration of the Congressional command would follow. See N.L.R.B. v. Speer, 94 N.L.R.B. 317. But even if the Board could "keep books" on the activities of a construction business, there is further reason for the Board's assuming jurisdiction over the whole business. A general contractor could hardly conduct his going business so as to avoid the influence of one job, not in commerce, upon another job, which is in commerce.

■ The Board based its assumption of jurisdiction in the instant case upon two grounds: First—since it was established that in both 1948 and 1949 Reed did over $50,000 [14] worth of business in services for public utilities and for establishments which

---

6. Hollow Tree Lumber Co., 91 N.L.R.B. 635.

7. Ibid.

8. WBSR, Inc. [Radio station], 91 N.L.R.B. 630.

9. Local Transit Lines, 91 N.L.R.B. 623.

10. Stanislaus Implement & Hardware Co., Ltd., 91 N.L.R.B. 618.

11. Borden Co., 91 N.L.R.B. 628.

12. Rutledge Paper Products, Inc., 91 N.L.R.B. 625; Dorn's House of Miracles, 91 N.L.R.B. 632.

13. Westport Moving and Storage Co., 91 N.L.R.B. 902.

14. Reed's 1948 activities included contracts with: Pacific Telephone & Telegraph Co., San Francisco, California, in the amount of $148,000; Pacific Gas and Electric Company, San Francisco, Cali-

produce or handle goods for out-of-state shipment, the Board determined that Reed was subject to its jurisdiction independently of his work for Stoneson. Cf. subhead (1) of the Board's criteria, supra. Second— during the year 1949 Reed was doing work under a subcontract in the sum of $110,239 for Stoneson Construction Company which organization was constructing a large apartment and commercial enterprise in San Francisco amounting in value to approximately $10,000,000 for which large quantities of materials were brought from out-of-state. The Board determined that Reed's activities for Stoneson were alone enough to bring him within its jurisdiction, since Reed was a builder doing $50,000 worth of business annually in services for a corporation "engaged in commerce within the meaning of the Act * * *."

Reed's activities in 1948 and 1949, other than for Stoneson, show a substantial effect upon interstate commerce. In the absence of a showing that Reed had completely abandoned the interstate aspects of his business prior to the time of the herein-alleged unfair labor practices, the Board was justified in concluding that his over-all activities retained their interstate complexion.

The Board's jurisdiction is also gained upon another basis, for Reed's activities in connection with Stoneson had in themselves a sufficient effect on interstate commerce to warrant it. And this is true because the Board found that, as a consequence of Stoneson's interstate purchases, it was a company "engaged in commerce within the meaning of the Act * * *." And, having made such a determination, the Board concluded that Reed's activities were inseparably integrated with the over-all Stoneson enterprise; and the portion of the whole embraced within his subcontract cannot be classed as a separate, independent job. Were this not so, the paradoxical legal conclusion would follow that, through the resort to subcontracting, it would be possible for parts of the enterprise to be outside the pale of the Labor Act while the whole thereof would be within the pale of the Act. A complete frustration of a legal policy of the Act would result.

■ We conclude that the Board has the legal power to take jurisdiction over a company's labor problems when the company's activities are a part of a single enterprise undertaken by a company which does "substantially affect" interstate commerce in connection with the enterprise, as here.

Having found that the Board was acting within its jurisdiction, we shall now examine the merits of its order.

The pertinent facts are as follows: Ernest Sydney Charlton, for almost fifty years, has been and still is a member of the respondent Union (International Hod Carriers, Building & Common Laborers Union). In 1949, he was hired by Reed as a hod-carrier without first getting clearance from his Union, despite his knowledge of the Union rule requiring him to do so. When the Union discovered his breach, it threatened to take all the hod-carriers off the job unless Reed discharged Charlton. Reed bowed to the Union's demand although he had entered into no union-security [15] contract with the Union.

Upon a complaint being filed by Charlton, the Board conducted a hearing and found that Reed had, in effect, granted closed-shop rights to the Union, thereby encouraging Union membership and enabling respondent Union to enforce obedience to its internal rules by job discrimination in violation of the Act. The Board concluded that in dismissing Charlton, Reed had violated sections 8(a)(1) and (3) of the Act and the Union had violated sections 8(b)(1)(A) and (2) of the Act.

The Union and Reed, in opposing a petition by the Board to enforce its order, take the position that they did not coerce Charlton in the exercise of the rights guar-

fornia, in the amount of $60,000. Reed's 1949 activities included contracts with: Pacific Telephone & Telegraph Co., San Francisco, California, in the amount of $150,000; Standard Oil Co. of California, San Francisco, California, in the amount of $200,000.

15. I.e., a union-shop as permitted by section 8(a)(3) or a closed-shop already in existence prior to the enactment of the Taft-Hartley Act, § 102 of the Act.

anteed him by section 7 of the Act, and that since Charlton was a Union member prior to his discharge, and remained a dues-paying member thereafter, that their act did not encourage or discourage Union membership. The Union further contends that it was merely enforcing compliance with its own rules by its own members and that Reed cooperated in this regard.

Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in section 7. And section 8(b)(1)(A) makes it an unfair labor practice for a labor organization or its agents "to restrain or coerce" employees in the exercise of their rights under section 7. Among the rights guaranteed by section 7 are: the right to self-organization and to form, join, or assist labor organizations, and "the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment" as authorized by section 8(a)(3).

■ Since no union-security agreement was in effect between Reed and the Union under the provisions of sections 7 and 8 (a)(3) at the time of Charlton's discharge, his employment by Reed must in no way depend upon his Union status. For, to the extent that Charlton disobeyed the Union's rules,[16] he was refraining from assisting a labor organization. His right to so conduct himself without fear of losing his job is guaranteed by section 7. Accordingly, the finding of the Board that the Union, in securing Charlton's discharge, and Reed, in firing Charlton for failure to obey Union rules, was a violation of section 8(a)(1) and 8(b)(1)(A) in that they coerced him in the exercise of his rights guaranteed by section 7, is supported by the law and the facts. Whether the coercion was or was not successful in accomplishing its object[17] is irrelevant. Its use was sufficient to constitute an unfair labor practice.

■ The Board further found that Reed committed an unfair labor practice by encouraging membership in the Union through discrimination in regard to hire in violation of section 8(a)(3) of the Act, and that the Union violated section 8(b)(2) in causing the employer, Reed, to violate section 8(a)(3). An examination of the record as a whole fails to disclose substantial evidence to support the Board's finding on this point.[18] For, while there may be a showing of discrimination in the firing of Charlton, there is no showing that the purpose or effect of the discrimination was to encourage his membership in the Union.[19] Indeed, the record shows that Charlton was already a Union member and that the discharge caused no change in his Union status. We do not here have the situation where a non-union man is discharged for his failure to join the union, or where a union man is discharged for his union activity. The facts here revolve around the internal affairs of a union and are thus not among the unfair labor practices condemned by sections 8(a)(3) and 8(b)(2) of the Act.

There are now pending before the Supreme Court of the United States two cases

16. The proviso in section 8(b) (1) to the effect that it is not an unfair labor practice for a union "to prescribe its own rules with respect to the acquisition or retention of membership therein" is not relevant here. It concerns only internal union relationships. For, in the absence of a union-shop contract, an employer is free to hire an employee regardless of his union status. Moreover, under the Taft-Hartley Amendment, when there is a union-shop contract the section 8(b) (1) proviso does not apply for section 8(a) (3) permits the union-shop to exist only on the condition that non-union men be eligible for hire if they agree to join the union within thirty days and on the further condition that the union can expel members only for non-payment of periodic dues.

17. I.e., compliance with union clearance rules.

18. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; section 10(e) of the Labor Management Relations Act of 1947, 29 U. S.C.A. § 160(e).

19. See Wells, Inc., v. N. L. R. B., 9 Cir., 1947, 162 F.2d 457, 459, 460; "'Discrimination' Under the National Labor Relations Act", 48 Yale L.J. 1152, 1156.

in which the question of encouragement of union membership is presented: In N.L.R.B. v. International Brotherhood of Teamsters, 8 Cir., 1952, 196 F.2d 1, there is no union-security contract and the decision is along the lines discussed above. A contrary conclusion in N.L.R.B. v. Radio Officers' Union, 2 Cir., 1952, 196 F.2d 960, was reached. In the Radio Officers case there was a union-security contract which makes Union membership a requirement of employment. Whether such fact influenced the decision, we do not know.

Since the Board's finding that sections 8(a)(1) and 8(b)(1)(A) have been violated is sufficiently supported by substantial evidence, we turn next to a consideration of Reed's claim that the Board's order amounts to a denial of due process and "is arbitrary, capricious and contrary to law for the reason that it was issued at a time when employers * * * in the building and construction industry were being effectively denied the benefit of the election provisions of the National Labor Relations Act." Reed cites in support of his argument the following language from The Plumbing Contractors Ass'n of Baltimore, Md., Inc., 1951, 93 N.L.R.B. 1081, 1086:

"If, as we think it must, the Board is to continue in appropriate cases to process complaints and issue cease and desist orders against labor organizations in the building industry, it would be most inequitable for the Board, at the same time, to deny to labor organizations the benefits which accrue from certification when, in appropriate cases, our jurisdiction is invoked. We do not believe that Congress intended that in this industry the Board would wield the sword given it by the Act, but that the labor organizations desiring it should be denied the shield of the Act. We believe, rather, that in providing that certain benefits would flow from certification, Congress intended that the shield should go with the sword, and that the Board should to this end assert jurisdiction in representation and union-security authorization cases to the same extent and on the same basis as in unfair labor practices cases."

The Board was there concerned with expanding, not limiting, its jurisdiction. Moreover, in that case the Board was discussing the problem created by acts of labor organizations which would be in violation of section 8(b)(4) or 8(b)(2) in the circumstances where those identical acts would not have constituted unfair labor practices had the labor organization been certified the exclusive bargaining agent of the employees under Section 9. The inequity referred to would arise since the labor organization's failure to be so certified was due to the Board's inability to devise a method for holding elections in the construction industry. However, the inequity could not arise here, since Charlton was a dues-paying member, and therefore the Union already had all the benefits it could obtain under the exception to section 7.[20]

Finally, we consider the appropriateness of the Board's order of reinstatement with back pay. Respondents seek to limit their liability to Charlton's loss of pay from June 14, 1949, the date of his lay-off, to June 24, 1949, the date upon which respondents claim Charlton would in the normal course of events have left Reed and returned to his usual place of employment.

The facts, as found by the Board, are that Charlton was hired for an indefinite period, with Reed agreeing to release him if his former employer asked him to come back. Two other employees were released on June 24, 1949, at the request of their and Charlton's former employer that they return to work for him. However, Charlton was not asked to return because of his dispute with the Union. The Board's order requiring that Charlton be offered reinstatement and back pay for the full period of his unemployment is "adapted to the situ-

---

20. " * * * except to the extent that [the right to refrain from union activities] may be affected by an agreement requiring membership in a labor organiza-tion as a condition of employment as authorized in section 8(a) (3)." 29 U.S.C.A. § 157. See provisos to Section 8(a) (3).

ation which calls for redress". N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381.

 Reed's reinstatement of Charlton subsequent to the Trial Examiner's intermediate report is no defense to enforcement of the order. N.L.R.B. v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 833, 94 L.Ed. 1067; N.L.R.B. v. Pool Mfg. Co., 1950, 339 U.S. 577, 581, 582, 70 S.Ct. 830, 94 L.Ed. 1077. It goes only to a computation of the back pay award, the purpose of which is to make the employee whole for any losses suffered as a result of the unfair labor practice. Phelps Dodge Corp. v. N.L.R.B., 1941, 313 U.S. 177, 197, 198, 61 S.Ct. 845, 85 L.Ed. 1271; N.L.R.B. v. Suburban Lumber Co., 3 Cir., 1941, 121 F.2d 829, 834, 835.

The Board's petition for enforcement of its order as modified to conform to this opinion is granted.

Granted.