PUERTO RICO LABOR RELATIONS BOARD, Petitioner, *v.* MILARES REALTY, INC., Defendant.

No. JRT-63-4. Decided September 29, 1964.

822

*J. B. Fernández Badillo,* Solicitor General, *José Orlando Grau, Luis Rivera Pérez,* and *Rafael J. Vázquez Colón* for petitioner. *Elí B. Arroyo* for defendant.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The Puerto Rico Labor Relations Board requested the court to enforce the order rendered by it against employer Milares Realty, Inc., ordering it to cease and desist from certain unfair labor practices, and ordering it to reinstate the workers Ángel Luis Ramos, Julio Ayala, Jorge Morales, Santiago González and Nicasio Trinidad, discharged because of union activities in their former employments or, if the latter should not exist, in others substantially similar, and to compensate said workers and Eleuterio Ortiz, for any loss of income they may have suffered because of its refusal to employ them, paying them an amount equal to that which they would have normally received during the time they were unemployed by reason of the refusal to employ them until the date on which employment is offered to them, after deducting the net income, if any, which they may have received for salaries during said period; plus interest at the legal rate on the loss, less said net income.

The court requested the employer Milares Realty, Inc., to show cause why it should not enforce the Board's order. The employer has appeared and alleges: (1) That the order is void (a) because at the date of issuance of the complaint there did not properly exist a "Board" with legal capacity to issue it, and (b) because the "Board" lacked and still lacks jurisdiction over the employer's activities; (2) that the Board exceeded itself in its legal authority to include in its decision and order, workers who were not included in the accusation; (3) that the findings of fact of the trial examiner are not supported by the record considered as a whole; and (4) that the Board exceeded itself in its legal authority in imposing on the employer the obligation to reinstate the workers, compensating them for the loss of income suffered by them plus legal interest. As a matter of

priority over any other contention we shall first consider the jurisdictional question, as it deals also with our own jurisdiction.

The employer maintains that the jurisdiction corresponds to the National Labor Relations Board.[1] The unfair labor practice charged in this matter—discharge by reason of union activities—is prohibited, and the right of the worker is protected by congressional legislation. Labor Management Relations Act of 1947, Taft-Hartley, 61 Stat. 136, §§ 7, 8(a)(1), (2) and (3), as amended by the Labor-Management Reporting and Disclosure Act of 1959, Landrum-Griffin, 73 Stat. 519. In view of said fact and the fact arising from the record, that the employer's activities, although entirely local in character as may be seen hereinafter, involved interstate commerce, upon considering the question of jurisdiction we must start from the premise that the Federal Law is applicable from the beginning. It seems to us that this was the basic point on which the Board decided the question. See, *National Labor Relations Board* v. *González Padín,* 161 F.2d 353[2] (1st Cir.); *Labor Board* v. *Fainblatt,* 306 U.S. 601; *Labor Board* v. *Reliance Fuel Corp.,* 371 U.S. 224; *Guss* v. *Utah Labor Board,* 353 U.S. 1; *San Diego Unions.* v. *Garmon,* 359 U.S. 236; 353 U.S. 26; *Polish Alliance* v. *Labor Board,* 322 U.S. 643; *United States* v. *Women's Sportwear Ass'n,* 336 U.S. 460, 464; *Retail Clerks Ass'n Dist. Co.* v. *John C. Groub Co.,* 149 N.E.2d 837 (Ind.); *Toomer* v. *Local, etc.,* 131 So.2d 248 (La.);

---

[1] The employer challenged the Board's jurisdiction to take cognizance of this matter from the beginning, when it answered the complaint.

[2] Up to what point does the pronouncement in *National Labor Relations Board* v. *González Padín Co.* (1st Cir.) made in 1947 pursuant to § 2(6) still preserves all its virtuality, *quaere.* See definition of "commerce" for the purpose of Landrum-Griffin Act of 1959. It is not necessary to enter now into those considerations because, whichever the evaluation to be made, in this case there was interstate commerce although the activity was of a local nature.

*National Labor Relations Board* v. *Suburban Lumber Co.,* 121 F.2d 829; *National Labor Relations Board* v. *Townsend,* 185 F.2d 378 (9th Cir.), *cert. denied,* 341 U.S. 909; *National Labor Relations Board* v. *Dixie Terminal Co.,* 210 F.2d 538 (6th Cir.).

█ The point to consider is whether, notwithstanding the decisions cited and the application of the federal legislation in first instance, the Board and this Court, when proper, may exercise their jurisdiction in circumstances similar to those revealed in the record. When the Labor Management Reporting and Disclosure Act of 1959 was enacted, Congress adopted a definition for "commerce", but expressly left, subsisting and unchanged, the original definition in the Taft-Hartley Act as to the amendments to said statute contained in the Act of 1959 (Landrum-Griffin, § 505 and Title VII). Simultaneously Congress amended § 14 of the Taft-Hartley Act of 1947 to add the following provisions:

"(c) (1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided,* That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.

"(2) Nothing in this Act shall be deemed to prevent or bar any agency or the courts of any State or Territory (including the Commonwealth of Puerto Rico, Guam, and the Virgin Islands), from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction."[3]

---

[3] Translation which appears in the Spanish version of the Labor-Management Relations Act of 1947, as amended by the Labor-Management Reporting and Disclosure Act of 1959, supplied by the National Labor Relations Board.

■ Sanctioned by the former provision of Congress, there are rules fixed by the National Board determining the exercise of its jurisdiction. One of said rules is to the effect that the National Board asserts jurisdiction in all operations which are nonretail or nonretailers' operations,[4] in which there is an annual outflow or inflow through the State boundaries of at least $50,000, whether said annual commerce is *direct* or *indirect*. For present purposes, the National Board has defined as *direct* inflow where the articles or services furnished to the employer are directly from outside the State, and *indirect* inflow where the articles are produced outside of the State but acquired by the employer from a trader or salesman who is within the State. To that effect, the Board generally estimates its jurisdiction over the employer's business during the most recent calendar year. The National Board has similarly determined that it will not assert jurisdiction, among other enterprises or persons, over private hospitals or over real estate brokers.[5] Let us see the employer and his labor activity.

The Board decided, adopting the conclusions of the trial examiner, that Milares Realty, Inc., is a corporation engaged in real estate and construction business, in the operation of which it utilizes the services of employees and is an employer within the meaning of § 2(2) of the Act.[6] Except as to the fact that it is an employer, the record does not support the conclusion. In the complaint filed by the Board it was charged in contention No. 1 that respondent Milares Realty was a

---

[4] "Nonretail operations".

[5] National Labor Relations Board, Jurisdictional Guide, U.S. Government Printing Office, 1963. See: *Siemons Mailing Service*, 122 N.L.R.B. 81, and the discussion contained therein of the jurisdictional rule of the Board; *Man Products, Inc.*, 128 N.L.R.B. 546, 547; *Int'l Longshoremen & Warehousemen's Union*, 124 N.L.R.B. 813, 814; *Carolina Supplies & Cement Co.*, 122 N.L.R.B. 88.

[6] The examiner who reached the conclusions did not preside at the hearing nor hear the evidence. He pronounced judgment on the evidence in the written record.

corporation engaged in the construction business in the city of San Juan, and it was an employer. In answering the complaint Milares denied that it was engaged in the construction business, although it admitted it was an employer under the law. At the commencement of the hearing before the Board the parties stipulated that contention No. 1 be considered amended as follows: "The respondent party is a corporation doing business mainly in the city of San Juan and in its operations it utilizes the services of employees and is, therefore, an employer within the meaning of Art. 2, § 2 of the Act." (Rec. p. 19.)

The evidence in the record does not support that the employer was engaged in the construction business or real estate business. As to this particular, Pedro L. Alfaro, Manager of Milares, Manager at the same time of Clínica Dr. Sein, and the person who employed and discharged the petitioners, testified. He said Milares Realty was founded in 1954 for the purpose of separating the real estate from the hospital business. Milares possessed the title of the lot and building of the hospital and the hospital business paid him a certain amount for rental. As such owner or person with title over the property, Milares was performing repairs, improvements, alterations and extensions in his property by administration. During said activity the facts in controversy arose. Alfaro testified that Dr. Sein was President of Milares Realty. The directors of Clínica Dr. Sein were the same directors of Milares. Also, that Milares was not constructing or engaged in the construction of any other work, nor does it appear from the record that it was the owner of any other property.[7]

---

[7] In an incident over the admission of evidence in which Milares intended to bring to the record the labor practice of Clínica Dr. Sein, when the adverse party objected, its attorney stated thus: "The problem is that Milares Realty has never had any activity with previous Unions. We understand that because of the duality of functions performed by the witness and because of the intimate relation between both corporations

 We must conclude on the evidence that on the date on which the events which gave rise to the complaint occurred the employer was not an enterprise engaged in general construction business, or real estate business, or lease of offices business. Milares' labor activity was merely that of a proprietor who enlarged, repaired, and reconstructed his property. For all practical purposes Milares and the Clínica seemed to be the same economic person, the same enterprise. In view of the facts, perhaps it could be inferred that the National Board does not exercise jurisdiction in this case since it does not exercise it over a private hospital.[8] Nevertheless, we shall not rely solely on this consideration to decide the jurisdictional question.

██ Whatever the relation or the identity with the hospital, Milares was performing a construction activity in which he employed workers and he was considered an employer. The construction work performed by the employer itself amounted to $265,917.15. Forty percent represented labor, that is, $106,000 more or less would be the cost of

and because of the history of negotiations and conduct in favor of the Unions, evidence of one may be utilized on behalf of the other for the following reasons: The witness is an official of both corporations; both corporations carry on their business in the same physical place, and the officials of both corporations are the same: I understand, in view of said circumstances, that the evidence on the previous conduct of a corporation may be taken into consideration for the purpose of determining which would be the conduct of the officials of the other corporation." (Rec. p. 187.)

[8] *Flatbush General Hospital*, 126 N.L.R.B. 144, and case cited therein, where the National Board adopted the position that the operations of a private hospital, although not wholly unrelated to "commerce," are essentially local in nature and, therefore, the effect on commerce of labor disputes in such hospitals is not substantial enough to warrant the exercise of the Board's jurisdiction. Compare: *Hospital Hato Tejas, Inc.*, 11 N.L.R.B. 155, in which because of the fact that 98 percent of the gross business of the hospital was realized from the treatment of veterans pursuant to a contract with the United States, because it was directly related to the National Defense the Board asserted jurisdiction. In the case at bar there is no agreement or relation whatsoever in that sense.

materials. The record unquestionably reveals that during the period from May 1961 to February 1962 (the workers were discharged in December 1961)., Milares had bought in the market from local merchants construction material manufactured outside of Puerto Rico,[9] in excess of $50,000. This would be the typical case of *indirect* inflow under the jurisdictional rule mentioned above.

The Board sustained its jurisdiction in this case on the following grounds which it stated in a former case of the same employer:[10]

"The employer introduced evidence to show that it had bought materials and equipment valued at $62,909.68 from enterprises whose operations affected the interstate commerce. During the period from May 1961 to February 1962, the employer, among other things, bought an elevator and an air conditioner equipment worth $29,203.80. The elevator as well as the air conditioner equipment are capital investments, which cannot be considered as construction materials. In determining the jurisdictional amount the purchase of capital investments are not computed."

It seems evident that the Board placed itself within the jurisdictional guide already mentioned applicable to operations in excess of $50,000 annually which are non-retailers' operations, but asserted its jurisdiction considering that in deducting the amount of $29,203.80, which cost was estimated as a capital asset or capital investment, the balance remained under said jurisdictional amount of $50,000. The employer maintains that there is no basis for distinguishing between one and the other articles and making said deductions, and in our opinion it is correct. In its rule the National Board has not made said distinction or designation and the acquisition of one or the other kind of

---

[9] The evidence shows a total sum of $62,909.68 in which there are items of "mixed concrete" valued at $9,753.38.

[10] Milares Realty and United Brotherhood of Carpenters, etc., P-1822, D-278.

articles produced outside of Puerto Rico was interstate commerce. Apart from the fact that once the building is completed the elevator would be as much of a capital asset or capital investment as the materials acquired for its construction. Its approach to the question would lead us to decide that the Board lacked jurisdiction in this matter. We are of the opinion that the rule invoked does not prevail in a situation like the present one. Said rule has been produced in terms of a whole group of employers and not of one in particular; it covers such employers who, although non-retailers, generally and usually are engaged in the interstate commerce with an *annual* volume of business of at least $50,000.

■ Within the activity covered by federal legislation on labor relations, the basic and decisive test for the intervention of the National Board has been that of the *effect or affectation* of a fact, labor dispute or unfair labor practice on commerce. The National Labor Relations Act of 1935, 49 Stat. 449, § 10(a).[11] Through a lengthy procedure and as a result of its own experiences the Board chiefly has been

---

[11] Section 10(a)—"The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in § 8) *affecting commerce.*"

The doctrine indicates that the sole fact that an employer is engaged in operations in interstate commerce or is related to said commerce has not been a determining factor to warrant the assuming of jurisdiction by the Board; neither the greater nor lesser volume of commerce and likewise the fact that it is engaged in an activity of local character has not been a determining factor for the non-intervention of the Board, but rather the manner in which in one case or the other the fact affects or may affect or project its consequences in commerce. Cases aforecited. *National Labor Relations Board* v. *Cantrall et al.,* 201 F.2d 853 (9th Cir.), *cert. denied,* 345 U.S. 996; *National Labor Relations Board* v. *J. L. Hudson Co.,* 135 F.2d 380 (6th Cir.), *cert. denied,* 320 U.S. 740; *National Labor Relations Board* v. *Suburban Lumber Co.,* 121 F.2d 829 (3d Cir.), *cert. denied,* 314 U.S. 693; *Wisconsin Employ. Rel. Bd.* v. *Chauffeurs Team, etc.,* 66 N.W.2d 318 (Wisc.), where it was stated that the criterion for jurisdiction of National Board through the years is the *effect* of the dispute upon the welfare of the nation through its obstruction of the free flow of commerce.

moderating the area of its intervention within the jurisdiction which it is permitted, exercising it as it believed that commerce is affected or may be affected and where said intervention is necessary to achieve the objects and purposes of Congress, or refusing to intervene when it has thought otherwise. Hence, such are the tests that prevail today as jurisdictional guides or rules of intervention and were sanctioned by Congress in 1959.[12]

■ ■ Under the standards stated the National Board has followed the invariable rule through the years of not asserting or not exercising its jurisdiction in the presence of a situation of facts such as the one arising in this case, in which although the employer bought construction materials in the interstate commerce when the labor dispute arose, this was an occasional traffic since the employer was not generally engaged in the construction enterprise; in which an employer's activity essentially of local character was involved such as the construction of his own building that, on the other hand its use was not related either to the interstate commerce, and in which, after the termination of the construction, it was improbable that said commerce would reproduce or continue indefinitely as something usual and ordinary. Under circumstances like the present or similar ones, the National Board has established the strict rule of not intervening because it believes that a labor dispute in such a situation does not substantially affect the commerce in general, and it does not require its intervention for the furtherance of its national ends and purposes.[13] In view of

[12] This policy of the National Board led to the situation of "no man's land jurisdiction" of the aforecited *Guss* v. *Utah Labor Board*, which Congress meant to remedy by amending § 14 of the Taft-Hartley Act of 1959 which in turn has created another area of uncertainty.

[13] Illustrating the foregoing, among others, are the decisions of the National Board in *Raybern Bus Service, Inc.,* 128 N.L.R.B. 430 (1960); *Magic Mountain, Inc.*, 123 N.L.R.B. 1170 (1959); *Ritcher Transfer Co.*, 80 N.L.R.B. 1246 (1948); *E. T. Gresham Co., Inc.*, 85 N.L.R.B. 891

the foregoing we can reasonably sustain the exercise of jurisdiction of the Board and of our jurisdiction in this matter, pursuant to the amendments to the Taft-Hartley Act by the Landrum-Griffin Act of 1959.[14]

Having sustained the jurisdiction we shall examine the other grounds for the employer's opposition. It maintains that when the complaint was filed and the proceedings were

(1949); *Breeding Transfer Co.*, 110 N.L.R.B. 493 (1954); *Seattle Real Estate Board, etc.*, 130 N.L.R.B. 608 (1961). And see, *Leedom* v. *Fitch Sanitarium, Inc.*, 294 F.2d 251, in which it is stated that the jurisdictional standards applied to nonretail operations is not necessarily all-inclusive of nonretailers' enterprises with a volume of $50,000, because the Board itself has not construed this standard in said manner. In said cases there were purchases made in interstate commerce for abundant amounts, greatly in excess of $50,000.

[14] We are conscious that there is much uncertainty and conflicting views as to the effect and mode of operation of the amendments of the Landrum-Griffin Act of § 14 of the Taft-Hartley Act particularly as to § 14 (c) (2). See criteria stated in: Elvis C. Stephens—*"The No Man's Land of Labor Relations Remains Unoccupied,"* Labor Law Journal, February 1963, pp. 192–200; Archibald Cox, *"The Landrum-Griffin Amendments to the National Labor Relations Act,"* 44 Minn. L. Rev. 257, 261 (1960); *Derouen* v. *Lard,* 121 So.2d 311 (La. 1960); *Barksdale & LeBlanc* v. *Local No. 130, Int. Bro. of E. W.,* 143 So.2d 770 (La. 1962); *Kempf* v. *United States Brotherhood of Carpenters and Joiners of America,* 367 P.2d 436 (Ore. 1961); *cf. Hirsch* v. *McCulloch,* 303 F.2d 208 (C.A.D.C. 1962); George M. Cohen: *"Congress Clears the Labor No Man's Land: A Long-Awaited Solution Spawns a Host of New Problems,"* 56 Nw.U.L. Rev. 333 (1961). It seems to us that the power granted by Congress to the agencies and state courts and those of the Commonwealth to assert jurisdiction in circumstances in which pursuant to § 14(c)(1) the National Board has established its non-intervention, entails the power of said agency or court to decide as to its own jurisdiction, without it being required, on a case by case basis, that the decision be made first by the National Board itself. Also conscious of the problem and of the difficulty in many cases to decide, even with the aid of jurisdictional standards, whether or not to intervene, the Board has established procedural means so that the parties in a dispute before state institutions or the institution itself, may request from it an advisory or consultative opinion as to whether or not it will exercise jurisdiction. Judging from the advisory opinions published, this procedure is used extensively and seems to be very useful. We deem it advisable that in the cases in which the jurisdictional question is not completely clear and evident, and generally it is not, the parties before our Labor Relations Board or the Board in its case, use the consultative pro-

ordered on February 8, 1962, there did not legally exist a Labor Relations Board, because one of the positions was vacant and without incumbent, and the term of office of Chairman Barela had expired, and the Labor Relations Act does not extend the term of incumbency until a successor is appointed, qualified, and takes possession. From the record it appears that the appointment of Mr. Barela had expired since June 19, 1960. The Labor Relations Act, in § 3 Act No. 130 of 1945 as amended, creates a Board composed of a Chairman and two associate members to be appointed for a term of 4 years. It provides that a vacancy in the Board shall not impair the rights of the remaining members to exercise all the powers of the Board, and that *two* of its members shall constitute quorum.

There is no doubt that in the absence of a holding over clause in the Act until a successor qualifies and assumes the position, Barela did not possess the legal title thereto after its expiration and from that time the Governor could make appointment to substitute him in his tenure inclusive, by a recess appointment. This does not mean, however, which presents another problem, that his official actions while he was not substituted, are null or void, whether or not he is considered as an official *de facto*. The fundamental public policy involved by virtue of which the courts legalize the actions of an official in Barela's position, was amply set forth and discussed in our decision in *González* v. *District Court*, 62 P.R.R. 152 (1943), and we need not comment again on the same considerations. See also *Fernández* v. *District Court*, 71 P.R.R. 149 (1950), *affirmed*, 184 F.2d 1015, *cert. denied* 341 U.S. 903; *Acosta* v. *District Court*, 63

cedure because in case it is definitely decided by this Court or eventually by the Supreme Court of the United States that the Board lacks jurisdiction and we, too, to enforce its orders, it might be prejudicial to the parties because of the limitation period to appear before the National Board against illegal labor practices. Taft-Hartley, § 10(a).

P.R.R. 626 (1944). Barela's actions were valid and there was a Labor Relations Board legally and properly constituted when the proceedings were ordered.

■■ The employer's third contention is that the Board exceeded its legal authority in including in its decision and order workers who were not included in the complaint. A complaint was filed before the Board charging the employer with having discharged workers Sergio Morales, Julio Ayala, and Nicasio Trinidad for union activities. After the investigation a complaint was filed including said persons and three other workers under the same charge. There is nothing in the Labor Relations Act against said action. Section 9 provides that any fundamental charges alleging the existence of an unfair labor practice may be submitted to the Board for its action, and that when it is *"charged"* that any person, etc., is engaged in any unfair labor practice, the Board . . . shall have the power to investigate such charge and cause to be served upon such person . . . a complaint *in the name of the Board* stating *"the charges"* in that respect. The complaint is the result of the investigation, not of the charge, and it may be as ample and embracing as the public interest may require in the tutelary function of the Board over labor relations. The employer had the opportunity to be heard and to defend himself against the accusation of unfair practice in relation to all the persons included in the complaint, although not all of them appeared in the original charge which has no other importance than to initiate the matter before the Board.

■■ The employer maintains, already in the merits of the case, that the decision of the Board is not supported by the evidence. We have painstakingly studied the record and although the reasons stated by the employer to suspend said workers when he did so—lack of shop—is compatible with the nature of employer's activity that was being carried

on—the construction of a work by administration and by stages—there is sufficient basis in the record for the Board to conclude that there could be a union motivation. There being evidence in the record to support the findings of fact of the Board, we shall not alter them, except as to worker Luis Ángel Ramos. The evidence weighed in the light of all the circumstances, is not convincing as to the fact that his discharge was the result of union activity. The record shows that worker Eleuterio Ortiz was reinstated in his employment three days after his discharge and he continued working. Worker Santiago González was under the care of the State Insurance Fund as the result of an accident suffered by him in the work on the date on which he was suspended on December 18, 1961, and the evidence shows that the employer called him back to work on January 2, 1962, and he did not report. Lastly the employer challenges the pronouncement of unpaid wages. The Board is empowered to make such pronouncement in ordering affirmative action and it may be one of the means or remedies to enforce compliance with the public policy of the Act. Section 9(1) (b) of the Act. *Labor Board* v. *Jones & Laughlin*, 301 U.S. 1, 48. See *Cooper* v. *Nutley Sun Printing Co., Inc.*, 175 A.2d 639 (N.J. 1961).

The decision and order of the Board in relation to workers Luis Ángel Ramos and Santiago González will be set aside. It will be enforced as to workers Julio Ayala, Sergio Morales and Nicasio Trinidad in all its pronouncements, and as to Eleuterio Ortiz, to the effect that payment be made of any wages that he may have failed to receive during the three days he was suspended. In view of the fact that the Board in issuing its order did not fix the exact amounts that said workers are entitled to receive by reason of loss of wages as a consequence of the employer's unfair labor practice, if there was any loss, any interest shall be com-

puted starting from the date on which the Board should fix said amounts and notify the employer.

As modified the order of the Board in this matter will be enforced.

