JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* ABELARDO CEIDE, h.n.c. FINCAS VICTORIA Y CARRIZALES, demandado; ABELARDO CEIDE, h.n.c. FINCAS VICTORIA Y CARRIZALES, peticionario, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada.

*Números:* JRT-62-7, JRT-62-8     *Resueltos:* 20 de diciembre de 1963

*Hartzell, Fernández & Novas,* y *Héctor M. Laffitte,* abogados del peticionario; *J. B. Fernández Badillo, Procurador General, José Orlando Grau,* y *J. F. Rodríguez Rivera,* abogados de la Junta de Relaciones del Trabajo; *Sara Torres Peralta, Ginoris Vizcarra,* y *Federico Rodríguez Pagán,* abogados de los *amici curiae.*

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En 16 de octubre de 1959 la Junta de Relaciones del Trabajo de Puerto Rico emitió una decisión y orden en el caso núm. CA-2085 [1] ordenando al patrono Abelardo Ceide

[1] En la referida decisión y orden, la Junta resume los hechos que el Oficial Examinador encontró probados, en la siguiente forma:

"Después que la Junta la certificó como representante de la mayoría de los empleados utilizados por el Querellado en una unidad apropiada para la negociación colectiva, la Unión de Trabajadores del Barrio Palmas, Afiliada al Sindicato de Trabajadores UPWA-AFL-CIO, requirió del Querellado que negociara el convenio colectivo para la zafra de 1959. El Querellado se reunió con la Unión en varias ocasiones, pero ni aceptó el convenio propuesto, ni lo consideró debidamente, ni hizo contraproposiciones

a que (a) cesara y desistiera de su negativa a negociar colectivamente con la Unión de Trabajadores del Barrio Palmas, afiliada al Sindicato de Trabajadores UPWA–AFL–CIO,(²) como la representante exclusiva de todos sus empleados en la unidad apropiada—todos los trabajadores empleados por dicho patrono en la finca Victoria, de Aguadilla, dedicados a la siembra, cultivo, corte y recolección de caña—o con cualquier otra organización obrera seleccionada por una mayoría de sus empleados en una unidad apropiada de negociación colectiva, al ser requerido para ello; y, (b) en manera alguna interviniera con, o restringiera a, o coaccionara a sus empleados en el ejercicio de los derechos que a éstos les garantiza el Art. 4 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 65. Para efectuar los pro-

---

de clase alguna, alegando que su situación económica no se lo permitía. Ante la insistencia del Querellado de que estaba en una situación económica difícil, la Unión modificó sus demandas con el fin de llegar a un acuerdo, pero el Querellado se mantuvo firme en su posición de que no podía aceptar ninguna de las cláusulas del convenio propuesto. El Querellado sostuvo también que no podía aceptar un convenio que incluyera descuento de cuotas (check-off) porque sus empleados le habían manifestado personalmente que no lo permitirían. El Querellado asumió una posición hermética en esta etapa de la discusión. No demostró la flexibilidad y el ánimo de llegar a un acuerdo. Fue un no rotundo sin posibilidad alguna de transacción."

Por la pertinencia que tiene con el presente procedimiento señalamos además que, según surge de una relación parcial del informe del Oficial Examinador que se transcribe en la decisión y orden, el patrono Ceide fue citado por la Unión para la discusión del convenio colectivo en dos ocasiones —17 de febrero y 4 de marzo de 1959, cuando ya evidentemente había comenzado la zafra de dicho año—pero se abstuvo de comparecer; que "no respondió prontamente a las llamadas de la unión para que acudiera a la discusión del convenio colectivo."

(²) La Unión había sido certificada en 2 de marzo de 1959 como representante de los obreros a los fines de negociación colectiva, en el expediente de certificación P-1425, después que las partes firmaron un acuerdo de elección por consentimiento.

En 26 de enero de 1962, fecha en que se formuló por la Unión el cargo que inició el presente caso, el patrono Ceide radicó una petición bajo el núm. PP-75 en la cual alegó que la Unión no tenía la mayoría de los empleados, "ya que los obreros le han expresado voluntariamente que no quieren le descuenten la cuota ni quieren saber de la Unión."

pósitos de la ley, se le ordenó tomar cierta acción afirmativa, y especialmente, se le requirió para que negociara colectivamente de buena fe con la unión mencionada. La Junta no solicitó de este Tribunal que pusiera en vigor la referida orden, conforme al procedimiento establecido en el Art. 9(2)(a) de la Ley, 29 L.P.R.A. sec. 70(2)(a).([3])

En 4 de agosto de 1961 el señor Nicolás Ferrer, organizador de la Unión, dirigió una comunicación escrita al patrono Ceide en la cual, entre otras cosas, le abordaba la discusión del convenio colectivo para regir las relaciones obrero-patronales comenzando con la zafra 1961-62, en las siguientes palabras: "Aprovecho la ocación [sic] para decirle que toda vez que este año, al igual que el pasado, se precisa empezar la zafra en el mes de diciembre, debemos discutir el nuevo convenio lo antes posible, de manera que al comenzar la zafra no tengamos entorpecimientos." No obtuvo respuesta alguna. En 13 de noviembre se le cursa una nueva comunicación en la cual se le acompaña una copia del proyecto de convenio para su estudio y se le advierte que si bien durante el año anterior (1960-61) no se firmó un nuevo contrato colectivo, rigiendo el del año anterior por disposición de una cláusula de prórroga en ausencia de notificación al efecto, "sus obreros exigen el nuevo convenio." Una vez más el patrono no contestó este requerimiento ni hizo proposición de clase alguna. El día 7 de diciembre, se le invita a firmar el convenio en la oficina del Lic. Manuel García Méndez, y se le indica que si no está conforme con reunirse se le espera

---

([3]) Claramente esta actitud de la Junta obedeció al hecho de que el patrono cumplió con la orden emitida. De la prueba aparece que en 7 de diciembre de 1959 el patrono y la Unión firmaron un convenio colectivo para empezar a regir en 1 de enero de 1960.

También se dispuso que en el caso de que cualquiera de las partes expresara su deseo de negociar un nuevo convenio, las partes "deberán reunirse durante el mes de septiembre a fin de tratar de llegar a un acuerdo sobre el nuevo convenio, de ser posible no más tarde de noviembre de 1960, a fin de que la dilación en llegar a un acuerdo o convenio no detenga el inicio de la zafra de 1961."

en las oficinas de la Unión "para discutir este asunto." En esta ocasión, Ceide rompe su hermético silencio, y remite una carta a Ferrer indicando su extrañeza sobre la invitación a firmar un convenio, "no sé a qué convenio se refiere ud . . . no fui sitado [sic] en ningún momento con anterioridad al día 30 de noviembre del presente año, para los fines de la negociación de un nuevo convenio tal como lo estipula el que expirará el día 31 de dic. del año en curso," y termina diciendo que ignora la fecha en que podrá reunirse para negociar debido a que sus múltiples ocupaciones con motivo de la inminencia del comienzo de la próxima zafra "no me permiten disponer de tiempo para otras cosas." Así las cosas, la zafra comenzó el día 16 de diciembre, sin que se firmara convenio alguno. No obstante, en carta de fecha 20 de diciembre el representante de los obreros le citó nuevamente para reunirse el día siguiente. Nuevamente se ignoró por el patrono el requerimiento de la Unión.

Nos hemos extendido en esta relación cronológica de los hechos sobre los intentos de la Unión para lograr que el patrono cumpliera con su obligación legal de negociar colectivamente, para que pueda apreciarse, con todo su relieve, la conducta observada en forma reiterada y consistente por Ceide, que motivó finalmente la radicación de un cargo por prácticas ilícitas ante la Junta de Relaciones del Trabajo. Difícilmente puede concebirse una actitud de mayor menosprecio a las disposiciones que, como cuestión de política pública, el legislador ha adoptado para garantizar la estabilidad y la concordia en las relaciones obrero-patronales. No sólo incumplió en cuanto a su deber de negociar, sino que pretendió ignorar al representante reconocido de sus trabajadores, e intentó negociar directamente con los obreros a espaldas de la Unión, con el manifiesto propósito de desalentar la matrícula de los empleados en la unidad que para la negociación colectiva había sido certificada dos años antes. Así, según su propia admisión, informó a los obreros que no se había

firmado convenio alguno, pero que "ellos ganarían el mismo jornal o salario que estaba pagando mi vecino la Comunidad Agrícola Bianchi que era mayor al estipulado por la Ley de Salario Mínimo y al convenio anterior . . ." y que "inmediatamente casi por unanimidad todos los obreros me dijeron que ellos no querían estar unionados con ninguna unión, que no permitían que se les dedujera de su jornal ninguna cuota o contribución que no fuera la del Seguro Social Federal. *Esto sucedió el mismo día que se inició el corte de caña . . .*"

La Unión recurrió a la Junta de Relaciones del Trabajo en 26 de enero de 1962, y formuló cargos de prácticas ilícitas fundándose en la negativa a negociar y por intervenir con los derechos de los empleados garantizados por el Art. 4 de la Ley. Al patrono se le notificó en 31 de enero, y dos días después, contestó al examinador designado para investigar los cargos que en ningún momento se le había citado para determinado lugar o fecha específica para discutir el convenio colectivo, *y por primera vez* aduce como motivo para su negativa a negociar que sus empleados no desean formar parte de la unidad contratante certificada ni que se les hagan descuentos para ser entregados a esta última entidad. El examinador investigó los cargos, para lo cual se trasladó a Aguadilla, y tomó declaraciones juradas los días 6 y 15 de febrero. Rindió un informe a su jefe inmediato en febrero 28, y éste, a su vez, lo transmitió con sus recomendaciones al Presidente de la Junta en 8 de marzo. En 6 de abril se presentó la querella correspondiente en la cual se alegó que el patrono había incurrido en las prácticas ilícitas previstas por los incisos (d) y (a) de la Sec. 1 del Art. 8 de la Ley.[4] La audiencia

---

[4] Estos incisos, 29 L.P.R.A. sec. 69(1)(a) y (d), leen así:
"Será práctica ilícita de trabajo el que un patrono . . .
"(a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por el artículo 4 de esta ley.
"(b) . . .
"(c) . . .
"(d) Rehúse negociar colectivamente con el representante de una ma-

se celebró el día 26 de abril. Aunque el patrono querellado no formuló alegaciones por escrito estuvo presente durante la vista y asistido por su abogado Santiago Quiñones Elías. Durante la misma se presentaron varios exhibits por el abogado de la Junta que se marcaron J-1 (a) a J-1 (p), todos los cuales se admitieron sin objeción y algunos de ellos por estipulación de ambas partes. (⁵) Se estipuló además que "El patrono acepta que la Junta de Relaciones del Trabajo de P.R. emita una orden en el sentido de que deberá sentarse a negociar un convenio colectivo con el representante debidamente autorizado en la unión querellante, [d]espués que dicho representante le haga una invitación de acuerdo con la ley para proceder a negociar. (⁶) El patrono reconoce además que la unión querellante es el representante colectivo de sus trabajadores." El oficial examinador rindió su informe el día 28 de mayo de 1962, en el cual, después de considerar todos los hechos, incluyendo los que dieron margen a la orden de 16 de octubre de 1959, expresó que "Las actuaciones anteriores del querellado y las que encontramos probadas en este caso nos crean el temor fundado de que en el futuro vuelva a incurrir en prácticas ilícitas de trabajo de igual naturaleza," y recomendó se solicitara del Tribunal Supremo que pusiera en vigor la orden que la Junta dictara.

En 13 de junio de 1962 la Junta emitió una decisión en el caso CA-2650 adoptando con ciertas modificaciones las determinaciones de hecho y conclusiones de derecho contenidas en el informe del oficial examinador, y que incluye las siguientes observaciones:

yoría de sus empleados en una unidad apropiada de negociación colectiva . . ."

(⁵) Forma parte de la evidencia admitida el expediente del caso anterior CA-2085, dentro del cual se examinaron hechos similares y se ordenó al patrono a negociar con el representante certificado de sus trabajadores.

(⁶) Se aceptó que el requerimiento formal para negociar se hizo en el curso de la audiencia misma.

"Coincidimos con el Oficial Examinador en su observación de que el patrono Abelardo Ceide ha demostrado su renuencia a negociar colectivamente con el representante de sus empleados, por lo que se requiere que utilicemos todas las disposiciones de la Ley para compelerlo a acatar el mandamiento de nuestro legislador de que los términos y condiciones de empleo deberán establecerse 'a través de la negociación colectiva.' Por la presente instruimos a nuestra División Legal para que gestione lo antes posible del Honorable Tribunal Supremo que ponga en vigor nuestra orden.

"Habida cuenta de que el patrono Abelardo Ceide se negó conscientemente a negociar con el representante exclusivo de sus empleados por segunda vez, *privándolos así de los beneficios de la negociación colectiva durante la zafra del 1962*, consideramos que la mejor forma de efectuar los propósitos de la Ley y de remediar el daño causado es, confiriéndole efecto retroactivo al convenio colectivo que se firme, si alguno, en virtud de los términos de esta orden.

"Consideramos que en dicha forma se remedia eficazmente la práctica ilícita cometida porque al negarse a negociar el patrono impidió que el representante de sus empleados gestionara una cláusula de retroactividad, como suele ocurrir en la fase agrícola de la industria azucarera.

"A pesar de que en este caso en particular el *cumplimiento* de esta nueva disposición de la Junta pudiera entenderse en la práctica como una especie de sanción o penalidad impuesta al patrono con el objeto de reparar el perjuicio causádole a los trabajadores al negarse a negociar con el representante colectivo de éstos—lo cual personalmente condenamos—, nos ha movido a la adopción de la misma remediar o evitar en lo sucesivo, sobre todo en la industria azucarera, en la que la zafra es tan corta, el que por meros tecnicismos o subterfugios, como queda comprobado, el patrono pueda dilatar el comienzo de la negociación hasta hacerla inoperante, con sólo esperar a que termine la zafra, o que se siente a negociar cuando la misma esté ya próxima a terminar."

En su parte dispositiva, se ordenó al patrono a cesar y desistir de rehusar negociar colectivamente con la Unión y de intervenir o restringir a sus empleados en el ejercicio de los derechos garantizados a éstos por el Art. 4 de la Ley, y, como

acción afirmativa, a negociar colectivamente con el representante exclusivo de los empleados, "Disponiéndose, que el convenio colectivo que se firme, si alguno, se haga retroactivo al comienzo de las labores del patrono por la zafra de 1962," y a fijar públicamente ciertos avisos.

Tanto la Junta de Relaciones del Trabajo como el patrono Ceide recurrieron ante nos, la primera para que se ponga en vigor la orden por ella dictada; el segundo, en solicitud para que se revoque o revise la misma. Acordamos consolidar ambos recursos. Oportunamente concedimos permiso para la intervención de *amici curiae*. (⁷)

Se señala que la Junta erró a) al incluir una disposición mandatoria sobre retroactividad del convenio cuya negociación se ordena, por ser la misma de carácter punitivo y constituir, además, una intervención indebida de dicho organismo en el proceso de negociación colectiva; b) al concluir que la negativa del patrono a negociar impidió que el representante de sus empleados gestionara una cláusula de retroactividad, como es costumbre en la fase agrícola de la industria azucarera; c) al ordenar al patrono para que cesara y desistiera de intervenir con sus empleados en el ejercicio de los derechos que les garantiza el Art. 4 de la Ley; y, d) al ordenar al patrono que cesara y desistiera de rehusar negociar colectivamente "con cualquier organización obrera," sin limitarlo a la unión que representa a sus trabajadores.

1–2. En la acción afirmativa que, a juicio de la Junta es necesaria para efectuar los propósitos de la Ley se requirió al patrono Ceide para que procediera a negociar colectivamente con la Unión, y expresamente se dispuso que "el con-

---

(⁷)Señalamos, de paso, la conveniencia de revisar nuestra Regla 18 sobre comparecencia como *amicus curiae* para precisar en forma más específica los casos en que debe permitirse tal intervención. Véanse, *Craig* v. *Harney*, 331 U.S. 367, 397 (1947) (opinión disidente); *The Amicus Curiae*, 55 Nw. U.L. Rev. 469 (1960); *Amicus Curiae: Friend of the Court*, 9 De Paul L. Rev. 30 (1959); cf. Regla 42 del Reglamento del Tribunal Supremo federal.

venio colectivo que se firme, si alguno, se haga retroactivo al comienzo de las labores del patrono para la zafra de 1962," que como indicamos en la relación de los hechos comenzó en 16 de diciembre de 1961. Esta disposición de retroactividad es impugnada por el querellado como una medida de carácter punitivo y no reparadora, y por los *amici curiae* como contraria a la política pública de la Ley de Relaciones del Trabajo de Puerto Rico por constituir una intervención indebida del Estado en el proceso de negociación colectiva.

■ (a) El Art. 9(1)(b) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 70(1)(b), provee que cuando la Junta fuere de opinión de que cualquier persona se ha dedicado o se dedica a cualquier práctica ilícita de trabajo, expedirá una orden requiriéndole que cese en, y desista de dicha práctica ilícita y tome tal acción afirmativa que permita efectuar los propósitos de la Ley, incluyendo, pero no limitándose, a la reposición de empleados, abonándose o no la paga suspendida, fijando o remitiendo por correo los avisos apropiados, y poniendo fin a convenios colectivos, en todo o en parte, o cualquier otra orden contra tal persona "que permita efectuar los propósitos de la Ley." Esta amplia discreción de la Junta para forjar el remedio está limitado por el requisito impuesto por los tribunales de que sea "apropiado," *N.L.R.B. v. Link Belt Co.,* 311 U.S. 584, 600 (1941), y "adecuado para la situación que intenta conjurar," *N.L.R.B.* v. *Bradford Dyeing Ass'n,* 310 U.S. 318 (1940); Goldstein, *Effectuating Policies of the National Labor Relations Act,* 20 B.U.L. Rev. 74 (1940).

■ Bajo una disposición similar de la Ley federal, 29 U.S.C. sec. 160(c), en *Consolidated Edison Co.* v. *National L.R.Bd.,* 305 U.S. 197 (1938), se caracterizó esta facultad de la Junta como reparadora y no punitiva, diciéndose en la opinión, a las págs. 235 y 236, que "Creemos que esta facultad para ordenar que se tome acción afirmativa no va tan lejos como para conferir a la Junta una jurisdicción punitiva que

le permita imponer al patrono una penalidad por el hecho de que haya incurrido en prácticas ilícitas, aunque la opinión de dicho organismo sea que con ello se logran los propósitos de la Ley." En idénticos términos, al referirse al estatuto local, dijimos en *Rivera* v. *Junta de Relaciones del Trabajo*, 70 D.P.R. 5, 13 (1949), que "Nuestra Ley es reparadora, no punitiva." Frecuentemente se han invocado, como lo hace el querellado Ceide, estos pasajes aislados de estas opiniones para resistir las órdenes emitidas por la Junta requiriendo determinada acción afirmativa. Sin embargo, es necesario explorar más detenidamente el verdadero significado de esta calificación de "ley reparadora" para comprender su verdadero alcance. Así, en el mismo caso de *Consolidated Edison*, supra, el Tribunal Supremo federal, señala que la facultad de la Junta para ordenar acción afirmativa "debe ejercitarse en auxilio de su autoridad para restringir violaciones y como *un medio para erradicar o evitar las consecuencias de la violación* [la práctica ilícita en que se ha incurrido] *cuando las consecuencias son de tal naturaleza que frustran los propósitos de la Ley*." El concepto de estatuto reparador fue explicado más claramente en *Republic Steel Corp.* v. *National Labor Rel. Bd.*, 311 U.S. 7, 10 (1940), cuando después de reiterar que la Ley es esencialmente reparadora, se añade: "No consiste de un programa penal que declare que las prácticas ilícitas de trabajo enumeradas constituyan delitos. La Ley no establece penalidades o multas para la reparación de derechos públicos ni provee para indemnizar por las pérdidas sufridas por la comunidad en contradistinción con la protección y compensación a los empleados" (pág. 10). Insistentemente se refiere a que la acción afirmativa debe propender a garantizar a los empleados aquellos derechos que el estatuto consagra, entre los cuales se destacan el de negociar colectivamente, y como corolario indispensable, el de disfrutar de los beneficios que se logren a través de la negociación. La acción afirmativa que contempla la Ley se dirige a

restituir al empleado afectado por la comisión de las prácticas ilícitas a la misma posición que ocuparía de no haberse observado la conducta detrimental. Entre estas medidas la que típicamente ilustra lo expuesto es el abono de los beneficios dejados de recibir, pero para evitar cualquier carácter punitivo, se le deducen las cantidades netas recibidas por el empleado en otras actividades, *Rivera* v. *Junta Relaciones del Trabajo*, 70 D.P.R. 5, 13 (1949); *Phelps Dodge Corp.* v. *N.L.R.B.*, 313 U.S. 177 (1941); *Bon Hennings Logging Company* v. *N.L.R.B.*, 308 F.2d 548 (9th Cir. 1962); *National Labor Relations Bd.* v. *Suburban Lumber Co.*, 121 F.2d 829 (3d Cir. 1941); Nota 45 Minn. L. Rev. 609, 633 (1961). Igualmente, se ha obligado al patrono a ofrecerle a los empleados protección adecuada contra actos de violencia encaminados a desalentar su afiliación a una unión, *National Labor Relations Board* v. *Ford Motor Co.*, 119 F.2d 326 (5th Cir. 1941); se ha ordenado la disolución de una asociación patronal para evitar se coartara la libertad de los trabajadores para desligarse de la misma, *National Labor Relations Bd.* v. *Newport News S.B. & D.D. Co.*, 308 U.S. 241 (1939); *National Labor Relations Board* v. *Greenebaum T. Co.*, 110 F.2d 984 (7th Cir. 1940), *cert. den.* 311 U.S. 662 (1940); se ha impedido que se ponga en vigor una cláusula de taller cerrado concertada con una unión patronal, *International Asso., Etc.* v. *National L. Rel. Bd.*, 311 U.S. 72 (1940).

Se arguye que la orden de la Junta sobre la retroactividad del convenio es de índole punitiva "pues la misma es *económicamente onerosa* para el patrono." Aparentemente se anticipa que uno de los frutos de la negociación colectiva será la fijación de salarios más altos que los que los obreros de las firmas Victoria y Carrizales percibieron durante el período de la zafra de 1962. Si así fuera, ha sido la conducta del propio querellado al negarse a discutir oportunamente según se le requirió por la Unión lo que ha dado margen a la situa-

ción de que se queja. Ciertamente, dentro del propósito reparador de colocar a la parte agraviada en la misma posición que hubiese tenido de no haber mediado la conducta constitutiva de práctica ilícita, esta acción afirmativa es posiblemente la única que proceda para hacer cumplir los fines de la Ley. Es palmaria su similaridad con las órdenes requiriendo la reposición del empleado y el abono de la paga suspendida.

Tampoco nos impresiona la afirmación de que la Junta federal no haya ordenado la retroactividad de un convenio en un caso de prácticas ilícitas como resultado de una negativa a negociar. La existencia de condiciones distintas en el clima obrero-patronal puertorriqueño en la fase agrícola de la industria azucarera—el trabajo estacional que se extiende por sólo unos meses al año, la negociación de convenios para regir usualmente durante el período de la zafra, la gran movilidad de la fuerza obrera y la existencia de organizaciones obreras relativamente más débiles—pueden explicar satisfactoriamente la necesidad de esta medida. Véase, no obstante, por analogía, *N.L.R.B.* v. *Preston Feed Corporation*, 309 F.2d 346 (4th Cir. 1962).

(b) No es necesario hacer acopio de generalizaciones expresadas por tribunales para sostener que nuestra Ley vislumbra una negociación colectiva "libre." Nadie lo discute seriamente. Pero nos encontramos frente a una situación de hechos que no es propicia para la aplicación sin sentido crítico de este principio abstracto, no importa cuán vehemente se aluda al hecho de que se restringe la libertad de las partes contratantes y se dificulte la negociación colectiva. Examinada la situación en su perspectiva real, surge meridianamente que la orden de la Junta en cuanto se refiere a la zafra de 1962 tiene certeramente el efecto de devolverle a la Unión la libertad de que precisamente le privó el patrono mediante el empleo de tácticas dilatorias para rehusar discutir el convenio, y lo que es más grave aún, lograr que transcurriera

toda la zafra sin negociarlo. Resulta un verdadero contrasentido invocar el carácter libre de la negociación colectiva cuando quien así implora ha desvirtuado el poder de regateo de la parte agraviada.

Convenimos en que uno de los objetivos básicos de la Ley es promover la negociación colectiva. No puede olvidarse, sin embargo, que estamos frente a una situación muy especial en que, como se indica en el alegato de la Junta "el patrono ha hecho inoperante la libertad de las partes en la mesa de la negociación colectiva" que requiere erradicar las consecuencias de la práctica ilícita en que se ha incurrido para lograr que en el futuro las partes disfruten plenamente de esa libertad que les consagró el legislador. Además, la intervención de la Junta al ordenar la "retroactividad" no tiene el alcance que se le atribuye pues, a nuestro juicio, no impone ninguna condición sustantiva en la negociación; todo cuanto requiere es que las partes negocien con ánimo de llegar a un acuerdo, pero, sea cual fuere el mismo, aunque no contenga mayores beneficios económicos para la Unión y sus miembros, y, por sus propios términos, si se llega a ese acuerdo, cubre un período anterior a la fecha de la orden. La medida adoptada constituye más bien un freno para advertir al patrono que en fin de cuentas nada ganará empleando tácticas dilatorias en la negociación. No se trata, como en *N.L.R.B.* v. *Insurance Agents International*, 361 U.S. 477 (1960), de que la Junta haya intentado controlar las armas económicas disponibles para las partes que le permiten intervenir indirectamente en la formulación del convenio. Véanse, notas en 21 Md. L. Rev. 234 (1961); 35 Tul. L. Rev. 255 (1960); 58 Mich. L. Rev. 1235 (1960); 109 U. Pa. L. Rev. 134 (1960); 74 Harv. L. Rev. 185 (1960). Cf. *N.L.R.B.* v. *Philamon Laboratories, Inc.*, 298 F.2d 176, 182–183 (2d Cir. 1962).([8])

---

([8]) En relación con otras acciones afirmativas requeridas por la Junta federal para efectuar los propósitos de la Ley, puede verse, *Morrison-*

Conviene aclarar, sin embargo, que como desde que se inició este recurso ha transcurrido no sólo la zafra de 1962, sino la de 1963, y que el precio del azúcar ha tenido un marcado cambio ascendente para esta última, la orden de negociar convenios por los años anteriores no debe entenderse que significa que las condiciones tengan que ser idénticas para ambos años. Véase, la Ley Núm. 38 de 31 de mayo de 1963 (Leyes, pág. 60) que enmendó el inciso (e) de la Sec. 9 de la Ley de Salario Mínimo de 1956, sobre aumentos y determinación del precio promedio del azúcar.

El peligro que se señala de que la Junta en el futuro pueda tratar de intervenir en la negociación para imponer otras condiciones como tipos de salarios, jornada de trabajo, pago de bonificaciones, y otras, es más aparente que real. No se nos ha señalado, ni tenemos conocimiento, que la Junta Estatal en sus dieciocho años de administración del estatuto haya intentado intervenir indebidamente en este aspecto de las relaciones obrero-patronales. De todas formas, siempre podría acudirse a los tribunales para evitar cualquier desviación en este sentido. Conviene apuntar que este aspecto de la intervención de la Junta en el proceso de la negociación colectiva se encuentra en proceso de aclaración y delimitación, cf. *N.L.R.B.* v. *Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342 (1958), comentado en 43 Minn. L. Rev. 1225 (1959), 13 Rutgers L. Rev. 378 (1958) y 4 Vill. L. Rev. 155 (1958). Además, por expresa disposición de ley—Art. 1(5) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 62(5)—los convenios colectivos son instrumentos para promover la política pública, y por ende, cualquier actuación que frustre su concertación en fin de cuentas sólo frustra la realización de la política pública que principalmente administra la Junta Estatal de Relaciones del Trabajo.

---

*Knudsen Co.* v. *N.L.R.B.*, 275 F.2d 914 (2d Cir. 1960), sobre reembolso de cuotas a los miembros de la unión, comentado en 13 Stan. L. Rev. 401 (1961).

Finalmente es de rigor apuntar que los remedios alternativos que se señalan, y que en cierto modo tienden a reflejarse en la eficiencia de la Junta, no estaban realmente disponibles. En primer lugar, la orden emitida en el caso CA-2985 no fue necesario ponerla en vigor judicialmente porque evidentemente, según aparece del escolio 3, el patrono le dio cumplimiento. Y en segundo lugar, el tiempo tomado por la Junta desde la radicación del cargo hasta la expedición de su decisión y orden es razonable considerando el procedimiento que para los casos de prácticas ilícitas se señala en su Reglamento. Más bien puede decirse que se desplegó toda la diligencia posible dentro de las circunstancias.

3. En el informe rendido por el oficial examinador se recomendó a la Junta que en la orden para cesar y desistir dirigida al patrono Ceide se incorporara un apercibimiento para que se abstuviera de rehusar negociar con la Unión de Trabajadores del Bo. Palmas, afiliada al Sindicato de Trabajadores, UPWA-AFL-CIO, "o con cualquier otra organización obrera seleccionada por una mayoría de sus empleados en una unidad apropiada de negociación colectiva al ser requerido para ello," y además, para que en manera alguna interviniera, restringiera o coaccionara a sus empleados en el ejercicio de los derechos que les garantiza el Art. 4 de la Ley. El querellado no radicó una exposición escrita presentando excepciones a este informe, según se requiere por el Art. 11 del Reglamento Núm. 2 de la Junta de Relaciones del Trabajo, 29 R.&R.P.R. sec. 64–11. En la orden final dictada por la Junta se incluyó el apercibimiento de cesar y desistir en la forma sugerida por el oficial examinador.

Arguye el patrono querellado que la prueba que tuvo ante sí el examinador no justifica una orden como la reseñada que le restringe no sólo en cuanto a rehusar negociar colectivamente con la unidad apropiada certificada oficialmente como el representante autorizado de los obreros, sino también en relación "con cualquier otra organización obrera selec-

cionada por una mayoría de sus empleados," y que se refiere, sin especificar, a los derechos garantizados a los empleados por el mencionado Art. 4. Antes de discutir este apuntamiento es necesario disponer del reparo que señala la Junta sobre su improcedencia fundándose en que como esta objeción no se presentó oportunamente ante ella, las disposiciones expresas del Art. 9(2)(a), 29 L.P.R.A. sec. 70(2)(a), nos impiden considerar la cuestión en esta etapa de los procedimientos. En efecto, dicho artículo en la parte pertinente prescribe que "Ninguna objeción que no se hubiera levantado ante la Junta . . . se tomará en consideración por la Corte, a menos que la omisión o descuido en la presentación de dicha objeción fuere excusada por razón de circunstancias extraordinarias." En realidad constituye la mejor práctica que la agencia a la cual se encomienda la administración de una política legislativa tenga la oportunidad de considerar en primera instancia todas las cuestiones que puedan suscitarse sobre la corrección y validez de sus órdenes y procedimientos. Así lo hemos reiterado en situaciones similares. *Junta Rel. del Trabajo* v. *I.L.A.*, 73 D.P.R. 616, 647–648 (1952); *Luce & Co.* v. *Junta Relaciones Trabajo*, 71 D.P.R. 360, 369–370 (1950). No obstante, no podemos convenir en que el mero hecho de no levantar oportunamente ante la Junta los reparos al informe del examinador prive a una parte de su planteamiento ante este Tribunal, cuando como en el presente caso, lo que se alega es que los pronunciamientos de que se querella no están justificados por la prueba admitida que constituye el récord que dio margen a la actuación de la Junta. En realidad la omisión de radicar una exposición de excepciones al informe del examinador tiene el efecto, según el Art. 11 del Reglamento ya citado, de someter el caso a la Junta a base del expediente. Pero no interpretamos que esa inactividad de una parte signifique que acepta todas las recomendaciones que el informe contiene. Corresponde a la Junta determinar si las mismas son procedentes, para lo cual no está obligada a seguir

invariablemente lo que dicho funcionario haya sugerido. *Rivera* v. *Junta Rel. Trabajo*, 70 D.P.R. 342 (1949).

■ Reviste gran importancia para la parte a quien va dirigida una orden para cesar y desistir conocer exactamente la conducta que se le restringe ya que la violación a la misma le expone a ser castigada por desacato. *National Labor Rel. Bd.* v. *Express Pub. Co.*, 312 U.S. 426 (1941); *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807 (7th Cir. 1962); *Canyon Corporation* v. *Nat. Labor Rel. Board*, 128 F.2d 953 (8th Cir. 1942). En términos generales puede afirmarse que los actos restringidos deben responder a la prueba aducida sobre los hechos constitutivos de las prácticas ilícitas cometidas, *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807, 810 (1962), y que la autoridad concedida a la Junta para prevenir prácticas ilícitas no debe ejercitarse en forma tan general que se extienda a conducta ilícita que no se ha observado o que no está razonablemente relacionada con los actos ilícitos establecidos mediante la prueba, *Communications Workers* v. *N.L.R.B.*, 362 U.S. 479 (1960); *N.L.R.B.* v. *United Ass'n of Journeymen, etc., Local 469*, 300 F.2d 649 (9th Cir. 1962), a menos que de las prácticas ilícitas cometidas pueda anticiparse que se incurrirá en el futuro en iguales o similares violaciones, *National Labor Rel. Bd.* v. *Express Pub. Co.*, 312 U.S. 426 (1941). Como se dijo en *N.L.R.B.* v. *International Longshoremen's & Ware. Union*, 283 F.2d 558, 568 (9th Cir. 1960), "se modificará una orden concebida en términos generales a menos que la evidencia demuestre una inclinación a incurrir en conducta ilegal, o cuando, bien la Junta o el examinador, ha hecho una determinación sobre la probabilidad de la comisión de violaciones similares." *N.L.R.B.* v. *Miscellaneous Drivers and Helpers Local 610*, 293 F.2d 437 (8th Cir. 1961); *N.L.R.B.* v. *Highway Truckdrivers & Helpers, Local No. 107*, 300 F.2d 317, 322 (3d Cir. 1962), señala que una orden amplia se justifica cuando la prueba revela un designio general de o un curso de

conducta que evidencia un menosprecio de las prescripciones de la Ley. Véanse, Linkoff, *The Courts and Administrative Agencies*, 29 Geo. L. Rev. 1026 (1941), y nota en 59 Harv. L. Rev. 624 (1946), comentando *N.L.R.B.* v. *Sun Tent-Luebbert Co.*, 151 F.2d 483 (9th Cir. 1945). La conducta anterior del patrono o de la unión es, pues, un factor a considerar al resolver sobre la justificación de la Junta al emitir una orden amplia y general, *N.L.R.B.* v. *Local 294, Internat'l Bro. of Teamsters, etc.*, 298 F.2d 105, 108 (2d Cir. 1961); *N.L.R.B.* v. *Standard Metal Fabricating Co.*, 297 F.2d 365 (8th Cir. 1961); *N.L.R.B.* v. *Atlanta Coca Cola Bottling Company*, 293 F.2d 300 (5th Cir. 1961); *N.L.R.B.* v. *Lexington Electric Products Co.*, 283 F.2d 54 (3d Cir. 1960); *Precision Fabricators* v. *National Labor Relations Bd.*, 204 F.2d 567 (2d Cir. 1953); *National Labor Rel. Bd.* v. *Charles R. Krimm Lumber Co.*, 203 F.2d 194 (2d Cir. 1953); *National Labor Relations Board* v. *Globe Wireless*, 193 F.2d 748 (9th Cir. 1951).

■ Los criterios expuestos precedentemente para evaluar la propiedad de una orden de cesar y desistir en términos amplios y abarcadores nos llevan a la inevitable conclusión que la emitida por la Junta dirigida al patrono Ceide en cuanto se refiere a la negativa a negociar con la Unión o con cualquier otra organización obrera seleccionada por la mayoría de sus empleados está plenamente justificada. No sólo en el informe del oficial examinador se alude al "temor fundado de que en futuro el patrono vuelva a incurrir en prácticas ilícitas de trabajo de igual naturaleza," sino que su conducta pasada revela claramente una actitud de resistencia abierta a la obligación de negociar colectivamente con el representante acreditado de sus trabajadores, hasta el extremo de pretender ignorar la unidad contratante e intentar entenderse individualmente con los obreros utilizando para ello medios que propenden a desalentar la matrícula en la unión. Cf. *N.L.R.B.* v. *Katz*, 369 U.S. 736 (1962); *N.L.R.B.* v. *Crompton Mills*, 337 U.S. 217 (1949); Notas, 76 Harv. L. Rev. 76,

210–214 (1962); 1961 Wis. L. Rev. 682. Debe advertirse que en el corto período de tres años la Junta se ha visto obligada a restringir en dos ocasiones la conducta del patrono Ceide, y en ambos casos, la misma revela un designio definido y claro de negarse a negociar o de demorar la negociación, logrando así que transcurra el período de la zafra, y colocando a la unión en una posición desventajosa en el proceso de la negociación colectiva. Es también significativo que, según señaló el representante de la Unión en el curso de la audiencia, la actitud de Ceide es única en la región cañera de Aguadilla.[9] Si la conducta del patrono está inspirada en el propósito de desacreditar y destruir la Unión, los términos de la orden de la Junta constituyen una advertencia oportuna de que siempre tendrá que negociar con la unidad representativa de sus trabajadores. Es tiempo ya de que el patrono entienda que la Ley de Relaciones del Trabajo tiene como uno de sus propósitos fundamentales fomentar la negociación colectiva en dicho campo.

Convenimos, sin embargo, que la orden de la Junta de cesar y desistir relacionada con la intervención en el ejercicio de los derechos garantizados a los empleados por el Art. 4 de la Ley, es demasiado amplia, pues la prueba solamente demuestra que el patrono ha intervenido únicamente con el derecho de sus obreros a negociar colectivamente a través del representante por ellos seleccionado. No debe extenderse la restricción cuasi interdictal a los otros derechos a que se refiere dicha disposición legal. *May Dept. Stores Co.* v. *National Lab. Rel. Bd.*, 326 U.S. 376, 392 (1945); *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807 (1962); *National Labor Rel. Bd.* v. *Express Publishing Co.*, 312 U.S. 426 (1941). Para un excelente análisis de esta última opinión a la luz del historial legislativo del estatuto y de los preceden-

---

[9] ". . . es la única colonia en toda esta jurisdicción que están los obreros huérfanos de un convenio colectivo y eso me está creando un problema serio aquí por el hecho de que la finca del señor Ceide está en un sitio céntrico y es la única colonia que no tiene convenio colectivo."

tes en que se apoya, véase, Manoff y Schmiedigen, *The Express Publishing Co. Case*, 23 B.U.L. Rev. 447 (1943); y además, notas en 41 Colum. L. Rev. 911 (1941) y 27 Va. L. Rev. 956 (1941).

4. Finalmente, se queja el patrono Ceide de que la Junta utilizó indebidamente su conocimiento de la realidad industrial—la determinación de que en la fase agrícola de la industria azucarera es frecuente retrotraer los convenios colectivos al comienzo de la zafra—para decidir cuál era el remedio adecuado a los fines de efectuar los propósitos de la Ley. Los abogados de la Junta disponen de este reparo en la siguiente forma:

". . . Admitimos que se privaría al demandado del debido procedimiento de ley si se concluyera que ha incurrido en una práctica ilícita de trabajo a base de hechos ('adjudicative facts') que éste no ha tenido oportunidad de controvertir. Pero la conclusión impugnada no se utilizó para adjudicar el caso en su fondo sino para legislar sobre el remedio ('legislative facts'). Véase, *Kenneth Culp Davis, Official Notice*, 62 Harv. L. Rev. 537, especialmente el escolio 52, págs. 554–55.

*"Davis dice que lo que quebranta el debido proceso de ley no es que la agencia acuda fuera del récord sino que no fundamente sus conclusiones para que la parte agraviada pueda impugnarlas.* En nuestro caso la parte agraviada ataca la utilización de un dato no incluido en el récord, pero no señala que la conclusión sea errónea."

En verdad no se trata de que las determinaciones de hecho de la Junta no estén sostenidas por la evidencia presentada, en cuyo caso no estaría vedada nuestra intervención, *Junta Rel. Trabajo* v. *Simmons, Int'l Ltd.*, 78 D.P.R. 375–386 (1955); *Rivera* v. *Junta Relaciones del Trabajo*, 70 D.P.R. 5, 8 (1949), pues para la conclusión escueta de que el patrono se ha negado a negociar y de que ha intervenido con los derechos garantizados a los trabajadores, el hecho de que los convenios en la industria azucarera son generalmente retroactivos no tiene especial significación y es hasta cierto punto completamente irrelevante.

*Con las modificaciones a que se ha hecho referencia en el curso de esta opinión, (¹⁰) se pondrá en vigor la orden dictada por la Junta de Relaciones del Trabajo en 13 de junio de 1962.*

El Juez Asociado Señor Santana Becerra emitió un voto separado, en el cual concurre el Juez Asociado Señor Hernández Matos. El Juez Asociado Señor Belaval no intervino.

—O—

Opinión separada del Juez Asociado Señor Santana Becerra

Aun cuando la Opinión del Tribunal analiza y califica la disposición de la decisión de la Junta referente al efecto retroactivo de la negociación colectiva que ordena, deseo acentuar el hecho de que la Junta de Relaciones del Trabajo no tiene facultad en ley para disponer que los pactos y convenios de la negociación colectiva que ella ordene llevar a cabo tengan efecto retroactivo en ningún caso, ni aun bajo la pretensión de que existen circunstancias especiales como creyó en el de autos.

Contra este patrono se radicó un cargo por una Unión representativa de sus empleados, imputándole que rehusaba negociar un convenio colectivo. El rehusar negociar colectivamente constituye una práctica ilícita del trabajo. Ley de Relaciones del Trabajo, Núm. 130 de 1945, Art. 8 (1) (d). Radicada la correspondiente querella y dispuestos los trámites de rigor, la Junta de Relaciones del Trabajo dictó su Decisión y Orden

---

(¹⁰) El aspecto de la orden de negociar que se incluye en la acción afirmativa requerida leerá como sigue:

"a) Negociar colectivamente con la Unión de Trabajadores del Bo. Palmar, afiliada al Sindicato de Trabajadores UPWA-AFL-CIO, como representante exclusivo de los empleados utilizados en la siembra, cultivo, corte y recolección de caña de azúcar en sus fincas Victoria y Carrizales.

"b) Negociar colectivamente también con la Unión de Trabajadores del Bo. Palmar, afiliada al Sindicato de Trabajadores UPWA-AFL-CIO, como representante exclusivo de los empleados utilizados en la siembra, cultivo, corte y recolección de caña de azúcar en sus fincas Victoria y Carrizales, para las zafras de 1962 y 1963.

para que este patrono cesara y desistiera de rehusar negociar colectivamente con la Unión o con cualquier organización obrera seleccionada por una mayoría de sus empleados como unidad para la negociación colectiva. Como acción afirmativa, ordenó a la vez al patrono negociar colectivamente en los siguientes términos:

"Negociar colectivamente con la Unión de Trabajadores del Bo. Palmar, afiliada al Sindicato de Trabajadores UPWA-AFL-CIO, como representante exclusivo de los empleados utilizados en la siembra, cultivo, corte y recolección de caña de azúcar en sus fincas Victoria y Carrizales; DISPONIENDOSE: que el convenio colectivo que se firme, si alguno, *se haga retroactivo* al comienzo de las labores del patrono para la zafra de 1962." (Énfasis puesto.)

La Orden está fechada en 13 de junio de 1962.

En el curso de su Decisión, la Junta se expresó así:

"Habida cuenta de que el patrono Abelardo Ceide se negó conscientemente a negociar con el representante exclusivo de sus empleados por segunda vez [1], privándolos así de los beneficios de la negociación colectiva durante la zafra del 1962, consideramos que la mejor forma de efectuar los propósitos de la Ley y de remediar el daño causado, es confiriéndole efecto retroactivo al convenio colectivo que se firme, si alguno, en virtud de los términos de esta orden.

"Consideramos que en dicha forma se remedia eficazmente la práctica ilícita cometida porque al negarse a negociar el patrono impidió que el representante de sus empleados gestionara una cláusula de retroactividad, como suele ocurrir en la fase agrícola de la industria azucarera.

"A pesar de que en este caso en particular el cumplimiento de esta nueva disposición de la Junta pudiera entenderse en la práctica como una especie de sanción o penalidad impuesta al patrono con el objeto de reparar el perjuicio causádole a los trabajadores al negarse a negociar con el representante colectivo de éstos—lo cual personalmente condenamos,—nos ha movido a la adopción de la misma remediar o evitar en lo sucesivo, sobre todo en la industria azucarera, en la que la zafra es tan corta, el que por meros tecnicismos o subterfugios, como queda com-

probado, el patrono pueda dilatar el comienzo de la negociación hasta hacerla inoperante, con sólo esperar a que termine la zafra, o que se siente a negociar cuando la misma esté ya próxima a terminar." [1] *Abelardo Ceide*, Caso Núm. CA-2185, D-208.

Las partes han discutido ampliamente si la Decisión, con su orden de retroactividad, tiene o no un carácter punitivo. El Procurador General en su alegato en representación de la Junta acepta que el Legislador no autorizó la imposición de penas o sanciones en el Art. 9 (1) (b) de la Ley. Ahí se autoriza a la Junta a tomar acción afirmativa que permita efectuar los propósitos del estatuto. Parece ser un hecho establecido bajo la legislación federal, patrón de la nuestra, que la Junta Nacional no tiene poderes punitivos. Cf. *Rivera* v. *Junta*, 70 D.P.R. 5 (1949).

Ante el argumento de la parte contraria de que la Junta Nacional de Relaciones del Trabajo nunca ha dictado una orden de esta naturaleza con cláusula de retroactividad, comenta: "El hecho de que la Junta Nacional de Relaciones del Trabajo no haya dictado una orden del jáez [sic] de la impugnada no demuestra que ésta sea ilegal. Todo lo que demuestra es que la Peticionaria [la Junta] está explorando nuevas avenidas a la luz de la realidad industrial propia de Puerto Rico."

Si bien las partes han dado énfasis a la naturaleza de la Orden en cuanto a si es de carácter "punitiva" o "remediadora", no creo que tenga mayor importancia el hecho en sí de la caracterización. Considerándola de tipo "remediadora" y por lo tanto permisible en ese sentido bajo las disposiciones del estatuto y la doctrina, el problema a mi juicio es uno más fundamental que cala hondo como cuestión de política pública en el campo de la relación obrero-patronal.

Incuestionable es que la Junta tiene poderes suficientes para obligar a las partes a negociar colectivamente, ya que la contumacia a hacerlo constituye una práctica ilícita del trabajo. Puede ejercer cuanta acción afirmativa sea apro-

piada y aconsejable para hacer que las partes se sienten a negociar, y tiene a su disposición el poder coercitivo de este Tribunal para hacer valer sus órdenes en tal sentido. (¹)

Pero fuera de hacer que las partes se sienten a negociar,

---

(¹) Los siguientes casos ofrecen algunas ilustraciones de tipos de acción afirmativa de la Junta en su función de hacer cumplir los fines del estatuto aparte de los específicamente enumerados por ley. Cf. *National Labor Relations Board* v. *Suburban Lumber Co.*, 121 F.2d 829, *cert. den.* 314 U.S. 693; *National Labor Relations Board* v. *Ford Motor Co.*, 119 F.2d 326; *National Labor Relations Board* v. *Greenebaum T. Co.*, 110 F.2d 384, *cert. den.* 311 U.S. 662; *National Labor Relations Board* v. *Carlisle Lumber Co.*, 94 F.2d 138, *cert. den.* 304 U.S. 575, y el mismo caso en 99 F.2d 533, *cert. den.* 306 U.S. 646; *N.L.R.B.* v. *Remington Rand, Inc.*, 94 F.2d 862, *cert. den.* 304 U.S. 576; *I.A. of M.* v. *Labor Board*, 311 U.S. 72; *Labor Board* v. *Newport News Co.*, 308 U.S. 241; *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303 U.S. 261; *Edison Co.* v. *Labor Board*, 305 U.S. 197, se dijo la acción afirmativa de la Junta no le confiere jurisdicción punitiva, aun cuando la Junta creyere que los fines del estatuto se cumplirían mejor con tal orden; *Labor Board* v. *Fansteel Corp.*, 306 U.S. 240, 257—la autoridad de acción afirmativa de la Junta es amplia pero no ilimitada; tiene la esencial limitación de las propias normas de la Ley que la Junta invoca; *N.L.R.B.* v. *Dallas General Drivers, etc.*, 228 F.2d 702—se sostiene el poder de la Junta y las cortes para *interpretar* un convenio colectivo, pero no para *dictar* los convenios de la contratación colectiva; *Singer Mfg. Co.* v. *N.L.R.B.*, 119 F.2d 131, *cert. den.* 313 U.S. 595—la Junta puede ordenar lo que manda el estatuto,—que se negocie de buena fe,—pero no puede dictar los términos del convenio; *N.L.R.B.* v. *Cape Co. Milling Co.*, 140 F.2d 543, 546; *N.L.R.B.* v. *Colten*, 105 F.2d 179, 182; *N.L.R.B.* v. *Nash-Finch Co.*, 211 F.2d 622, 627.—Es claro que la Junta no puede, directa o indirectamente, imponer concesiones o de otro modo pasar juicio sobre los términos sustantivos de la negociación colectiva. Si el contrato debía tener cierta cláusula propuesta por la Unión, era una cuestión a ser determinada a través de la mesa de negociaciones, no por la Junta; *Cone Brothers Contract Co.* v. *N.L.R.B.*, 235 F.2d 37, 41, *cert. den.* 352 U.S. 916; *Terminal Ass'n.* v. *Trainmen*, 318 U.S. 1, pág. 6;— La ley de trabajo de los ferrocarriles, como la *Ley Nacional de Relaciones del Trabajo,* no asumen la reglamentación gubernamental de salarios, horas o condiciones de trabajo, proveen el medio para que haya acuerdo sobre ello—; *Labor Board* v. *Insurance Agents*, 361 U.S. 477;—La confección de convenios de trabajo no es ni para la Junta ni para las cortes—; *N.L.R.B.* v. *Herman Sausage Co.*, 275 F.2d 229; *Labor Board* v. *Borg-Warner Corp.*, 356 U.S. 342 en donde, a pesar de que la opinión del Tribunal no demuestra que la Junta trató de intervenir en la parte sustantiva de la negociación, aun así los jueces Sres. Harlan, Clark y Whittaker expresaron el temor de que el fallo podía abrir la puerta para una intromisión de la Junta en los aspectos sustantivos del proceso de negociación colectiva, cosa no concebida por la Ley de Relaciones del Trabajo.

—y que negocien de buena fe,—la Junta no tiene poderes para intervenir en la negociación colectiva en sí, ni facultad en ley para hacer producir un convenio colectivo. Un mandato de la Junta ordenando que las partes negocien colectivamente, y que "el convenio colectivo *que se firme*, si alguno, *se haga* retroactivo al comienzo", etc., constituye a mi juicio una no autorizada intervención en la negociación colectiva en sí. De hecho la Junta se sienta como una tercera parte en la mesa de negociación. Esto, a mi juicio, desnaturaliza y destruye la naturaleza misma de la contratación colectiva que descansa en la esencial libertad de patrono y obrero para establecer de mutuo acuerdo las condiciones de trabajo. Envuelve, a mi juicio, una intervención del Estado en la sustancia de la contratación colectiva a través de un organismo suyo.

Si por Ley la Junta tuviera facultad para hacer producir un convenio colectivo, y la tuviere este Tribunal en su función de hacer valer las órdenes de la Junta, podría quizás argüirse que la facultad de ordenar que a un convenio se le dé efecto retroactivo podría ser un derivado lógico de la facultad de hacer producir un convenio. Sin embargo, tal facultad de hacer producir un convenio no existe en la Junta.

La retroactividad del producto del convenio constituye a mi juicio el instrumento por excelencia de regateo y de defensa del obrero en la mesa de negociación, a cambio de lo cual puede obtener otras concesiones favorables, y es también uno de los medios mas llamados a evitar de inmediato la huelga o paralización de las actividades.

Dentro del marco estrecho de este asunto específico, *como este caso*, no discuto la buena intención de la Junta de querer proteger al empleado. Pero vista la cuestión en sus proyecciones amplias, a la luz de la política pública laboral y de la filosofía de una contratación colectiva enteramente libre, el precedente sentado haría más daño que bien a la larga. Aun en el caso específico de ahora, hará más difícil el que se

produzca un convenio, aun cuando las partes se sienten de buena fe a negociar. (²)

La situación en estos casos está sencilla pero muy objetivamente retratada en los siguientes conceptos que forman parte de la historia legislativa de esta legislación, expuestos por el Senador Walsh, Presidente del Comité del Senado de Educación y Trabajo en torno a la Ley Wagner, y que me tomo la libertad de reproducir aquí del alegato de los *Amici Curiae,* quienes argumentan contrario al mandato retroactivo de la Orden:

"El proyecto indica el método y manera de seleccionar sus representantes o exponentes, y llevarlos hasta la puerta de la oficina de su patrono con autoridad legal para negociar a nombre de sus compañeros empleados. *El proyecto no va más allá de esa puerta.* Deja la discusión entre el patrono y el empleado, y los acuerdos a los que ellos pueden o no llegar, voluntarios, y con aquella santidad y solemnidad con que deben estar revestidas ambas partes en un contrato voluntario." (Énfasis puesto.)

La Junta explica su acción como un medio más efectivo de hacer valer su Decisión. El peligro está, una vez que se destruye la esencia de la absoluta libertad de las partes en cuanto al aspecto sustantivo de la negociación y entra la intervención del Estado, en que la determinación de cuándo la Junta está justificada en intervenir dependerá de su propio criterio, y lo justificará siempre que honestamente crea que con ello hace más efectivas sus decisiones. El peligro para mí es claro, aparte de que entiendo que ésa no es la ley.

Al ponerse en vigor la Decisión de la Junta en este caso, eliminaría el "Disponiéndose" de la Junta ordenando dar efecto retroactivo a cualquier convenio que se firmare.

El Juez Asociado Señor Hernández Matos me ha autorizado para que haga constar que concurre en esta opinión separada.

_____

(²) El convenio colectivo propuesto no se limita sólo a la fijación de salarios. Tiene todas las cláusulas típicas ya conocidas de tales convenios.